CASE 10.—ACTION BY ANN W. WALTERS' E ECUTORS AGAINST THE CENTRAL UNIVERSITY OF KENTUCKY TO CANCEL A NOTE EXECUTED BY THE INTESTATE AS A DONATION TO SAID UNIVERSITY.—February 22.

## Central University of Kentucky˙   Walters' Exrs.

122   65
e131  490

Appeal from Madison Circuit Court.

J. M. BENTON, Circuit Judge.

Judgment for plaintiffs, defendant appeals.    Reversed.

1. Constitutional Law—Charter of University—Reserved Power of State—A university corporation, organized in 1873, took the powers granted subject to the reserved right in the State, under the general statute of 1856, to alter, amend, or repeal its charter.

2. Colleges and Universities—Consolidation—The consolidation of a college and a university owned and conducted by the Northern and Southern Presbyterian Churches was not a diversion of the purpose of the original incorporators, or of those whose means set the institutions on foot.

3. Same—Statutory Provision—Ky. Stats., 1903, section 555, providing that any two or more corporations organized under the law of the State may consolidate into a single corporation, authorized the consolidation of a college and a university owned by the Northern and Southern Presbyterian Churches, respectively.

4. Same—Effect of Consolidation—The effect of the consolidation of a college and a university is to 'continue in the new corporation all the property rights, subject to the terms on which they were acquired, of the constituent corporations, including a note to one of them for the purpose of endowing a chair therein.

5. Bills and Notes—Consideration—The consideration of a note given to endow a chair in a university located in the city where the maker resided did not fail by reason of the con-

vol. 122—5

solidation of the university with a college and the removal of the location of its principal seat to another place, in the absence of any express condition in the note.

JACKSON & ROBERTS for appellants.

THOMAS W. BULLITT and JOHN T. SHELBY of counsel.

POINTS AND AUTHORITIES.

1. An action to cancel a contract is not an action upon a contract, and section 72, Bullitt's Code, does not give jurisdiction to a court outside of the county of the residence of the corporation in an action to cancel a contract. (Bullitt's Ky. Code, section 72.)

2. In a written contract it is not competent without an allegation of fraud or mistake to aver a different consideration for the contract than that set forth on its face, or to vary in any particular by averment or parol testimony the terms of the contract. (Logan, &c., Turnpike Co. v. Pettitt, 2nd, B. Mon., 428; McKegney, &c., v. Widenberg & Co., 6 Bush, 107; Greenleaf's Evidence, section 275; Jones' Evidence, sections 437, 438, 505 506; Stephens' Digest Law of Evidence, article 90.)

3. Terms of subscription cannot be varied by parol evidence. (Note 2, Parker v. Thomas, 81 Am. Decisions, 396; Wight v. Shelby Railroad, 16 B. Mon., 6; Martin v. Pensacola Railroad, 75 Am. Decision, 713.)

MOTIVE AND CONSIDERATION DISTINGUISHED.

4. Am. & Eng. Ency. of Law, 2nd Ed., Vol. 6, page 672 and note 2; Langdell's Summary of Law of Contracts, paragraph 60.

5. The obligation to apply the subscription in a particular way is sufficient consideration to support the donation or subscription. (Collier v. Baptist Education Society, 8 B. Mon., 68; Carr's Exor. v. Robinson & Dudley, 8Bush, 269; Am. & Eng. Ency. of Law, Vol, 29, page 335, and ample authorities there cited in notes.

6. Change of location does not avoid subscription. (Bryan v. Millersburg College, 90 Ky., 325, 338-9; Pennsylvania College cases, 13 Wallace, 190; Fuqua v. Hopkinsville Academy, 22 Ky. Law Reporter, 744; Carroll County Academy v. Gallatin Academy, 20 Ky. Law Reporter, 824; Fry's Exor. v. Lexington, &c., Railroad Co., 2nd Met., 314; Mead v. Ballard, 7 Wallace, 290; Texas & Pacific Railroad Co. v. City of Marshall, 136 U. S., 403.

FORMAN & FORMAN for appellees.

A. R. BURNAM and BURNAM & MOBERLY of counsel.

SYNOPSIS OF BRIEF FOR APPELLEES ON EFFECT OF CON-
SOLIDATION.

1. In order to effect a valid consolidation of two or more
private corporations, be they commercial or eleemosynary, there
must co-exist, and be an union of:

(a) The consent of the State, granted by general statute,
special enactment, or bestowed upon the consolidating corpora-
tions by express provision therefor in their charters, and

(b) In case of commercial corporations, the unanimous consent
of all the shareholders, or the privilege to those dissenting to
withdraw and receive payment for their stock at its market value
as of the date of the consolidation; and in case of eleemosynary
corporations, the unanimous consent of their governing boards,
by which is meant all those in control and having a voice in the
government of the institutions consolidating.   (Morawetz on
Private Corporations, 2nd Ed. Vol. 2, sections 940 and 941, sec-
tions 396, 646; Pearce v. Madison R. R. Co., 21 How., 442; Clear-
water v. Meredith, 1 Wall., 25; Aspenwall v. Ohio R. R. Co., 20
Ind., 492; State v. Dailey, 15 Ind., 51; L. & N. R. R. Co. v. Howard,
24 Ky. Law Rep., 865; Mowrey v. Ind. R. R. Co., 4 Biss., 78; Tuttle.
v. Mich. R. R. Co., 35 Mich., 247; N. O. R. R. Co. v. Harris, 27
Miss., 540; Stevens v. Rutland R. R. Co., 29 Vt., 565; Lauman v.
Lebanon, &c., R. R. Co., 30 Pa. State, 46; Black v. Del. Canal
Co., 24 N. J. Eq., 467; note 89 Am. St. Reps., 621; Kohl v. Lien-
thal, 87 Cal., 378; Market St. Hy. Co. v. Helman, 109 Cal., 571;
State v. Bailey, 16 Ind., 46; Betts v. Simpson V. T. Co., 88 Ky.,
54; McVicker v. Ross, 55 Barbe, 247; International Ry Co. v.
Bremont, 53 Tex., 96.)

2. The effect of consolidation thus made is to create a new
corporation—a legal entity—distinct from any and all of the con-
stituent corporations and vest it with title to all the property
owned by the consolidating corporations absolutely and uncon-
ditionally.   But property or funds held by consolidating eleemosy-
nary corporations donated thereto in trust for particular and
certain purposes or upon certain conditions, express or implied,
annexed to the title by the donors, do not pass to the consolidated
institution in the absence of the consent of the donors.   As to
such property and funds the consolidating institutions are simply
the holders of the legal title as trustees of sacred and express

Central University of Kentucky v. Walters' Exrs.

trusts; and cannot without the consent of the settlors change the trustee or beneficiaries of such charitable trusts, and thereby divert the funds to uses not contemplated by and inconsistent with the intention of the donors. (Penn. College Cases, 13 Wall; Atlantic Ry Co. v Ga., 98 U. S., 359; State v. Adams, 44 Mo., 570; R. R. Co. v. Canal Co., 21 Pa. State, 22; Vicksburg Tel. Co. v. Citizens Tel Co. (Miss.), 89 Am. St. Rep., 656; Adams v. Yazoo R. R. Co. (Miss.), 60 L. R. A., 33; note 89 Am. St. Rep., 613, and cases therecited; St. Louis R. R. Co. v. Berry, 113 U. S., 937; Shields v. Ohio, 95 U. S., 319; Adams v. Me. C. R. R. Co., 66 Maine, 488; Gladding v. St. Matthews Church (R. I.), 65 L. R. A. 225.)

3. The legal effect of consolidation upon the consolidating corporations is a matter of statutory construction; and under the statutes the effect of consolidating under which is to create new corporations out of the consolidating companies, the articles of consolidation become the charter of the consolidated company— its life—the source of its franchises and powers—and are not simply amendments to the charters of the constituent corporations, nor merely changes in their internal administration They are articles of grant, even though the grant be made by reference to the charters of the old companies; and the consolidated company takes everything by grant and nothing by transmission; and the change wrought is fundamental and not merely an amendment or change in internal administration. (Morawetz on Private Corporations, sections 942, 946 and 646; Shields v. Ohio, 95 U. S., 319; State v. Northern Cen. Ry Co., 44 Mo., 131; R. R. Co. v. Maine, 96 U. S., 509; Lauman v. Lebanon V. R. R. Co., 30 Pa. St., 46.)

4. Under the Kentucky Statutes and Articles of Consolidation between Centre College and Central University, the payee of Mrs. Walters' note, by its own voluntary act, wrought its own legal destruction and has not been in existence as a legal entity since July, 1901. The note was a charitable gift—and held by the old Central University as trustee of an express and sacred trust, to-wit: The endowment of Henry Bell Walters Professorship of Mathematics in Cetral University, an institution created by the act of 1873 as a rival to Centre College and placed for that purpose under the control and influence of the Southern Presbyterian Church of which she was a devoted member. Neither she nor those representing her consented to the consolidation, and to now require her estate to pay this note to the institution created by the consolidation would be, in effect, to require her to make a charitable gift to an institution which did not exist when the note was executed, which has no claim upon her sympathies

or love, and which is under the partial control and influence of a religious organization of which she was not a member or adherent and to whose doctrines she did not subscribe.

5. The Central University, created by act, 1873, was a private eleemosynary institution; and its charter was a tripartite agreement to which the State of Kentucky, the Alumni Association or corporation, and the donors to the institution were the parties. The right did not exist in any one of these parties—not even in the sovereign power of the State—or in any two of them acting in conjunction, to consent to and encompass a radical and fundamental change in this contract, evidenced by the charter, such as is wrought by a consolidation with another corporation, without the consent of the third party to the contract so as to be legally bind such third party by the change attempted to be made.   (Trustees Dartmouth College v. Woodward, 4 Wheat; City of Louisville v. President and Trustees University, &c., 15 B. Monroe, 642; State v. Adams, 44 Mo., 570.)

6. There is not even a pretense that Mrs. Walters or her representatives ever consented to or have since ratified the consolidation of Centre College and Central University. On the contrary no such consent was given nor such ratification made. The power to consolidate was not given in the contract—the charter—under which the gift was made; nor was such power reserved by the State when the charter was granted, either by general statute or in the charter itself.   The general statute of 1855 in force reserving power in the State to repeal or amend all charters or grants to corporations since February 14, 1856, does not apply or affect the rule, for consolidation is neither repeal or amendment by the State.   It is the surrender of the old charter and creation of a new corporation by the consolidating companies with the permission of the State.   But even if consolidation were repeal or amendment by the State it would not change the rule, for the statute of 1855 expressly provides that "no amendment or repeal shall impair other rights previously vested," and the rights of Mrs. Walters under the charter had become vested long before the consolidation.   (General Statutes, 4th Ed., 1887, chapter 68, section 8; Griffin v. Kentucky Ins. Co., 3 Bush, 592; Sage v. Dillard, 15 B. Mon.)

OPINION BY JUDGE O'REAR—Reversing.

A schism in the Presbyterian Church of the United States of America resulted in about 1865 in the with-

drawal of a considerable number of its members, who
subsequently organized themselves into a separate
body known as the Presbyterian Church of the United
States.    Historically their difference grew out of
·political questions and the deep feeling wrought by
the distractions of the Civil War, then just ended.
There seems to have been no difference in doctrinal
faith or teaching.   The original church had in 1819
founded an institution of liberal education at Dan-
ville, Ky., Centre College.   It had been maintained
as an institution of the church, and had been added
to all along until 1901.   After the division of the
church in 1865, the Presbyterian Church of the United
States, usually called the "Southern Presbyterian
Church," found itself, as the result of unsuccessful
litigation with the other branch, generally called the
"Northern Presbyterian Church," without an educa-
tional institution; it having been decided by the
courts that the school property belonged exclusively
to the latter body.   Thus excluded from participation
in the control of the college, in which hitherto they
had been interested in common with their fellows,
they set about establishing one of their own, where
their youth could be instructed in the liberal arts and
science under tutorship and conditions believed to
be most consistent with their spiritual faith and
temporal well-being.   So, in 1872, at a gathering at
Lexington, Ky., of the alumni of Centre College and
the alumni of other institutions of learning who held.
allegiance to Southern Presbyterianism, a memorial
was addressed to the Synod of Kentucky (Southern
Presbyterian), submitting that it was the sense of
that convention "that steps be taken to at once estab-
lish, on a broad and liberal basis an institution of the

highest order, under the auspices of the Synod of Kentucky, and thus carry out the earnest wishes of the fathers, as demonstrated by the establishment of Centre College, now lost to this church." As a result of the representations and efforts then made and undertaken, a university was established under the auspices of the Southern Presbyterian Church in Kentucky, acting officially and formally through its synod. A charter was procured from the Kentucky Legislature March 3, 1873. The institution thus formed was named the "Central University of Kentucky." An endowment was provided by donations subscribed by members and friends of that church. The university was under the control of a board of curators, who were elected at intervals by a body known as the "Alumni Association." A school of theology, as a branch of the university, was also provided for, to be under the direct control of the synod or synods contributing to its support. The institution was purely eleemosynary. Subscribers of certain amounts to the endowment fund had certain voting privileges in the Alumni Association, but those privileges had no dividend or money value. Section 1 of article 6 of the charter of the university provided: "The said Alumni Association shall have the power to determine the location of said university buildings. In determining that question, each member subscribing $100 to the university shall be entitled to one vote, and for $500 subscribed to two votes, and for every $500 subscribed in addition thereto he shall be entitled to one additional vote, and on any proposition to change the location the same rule shall apply. On all other matters each member shall hove but one vote."

In the provision for securing an endowment as an inducement to subscibers it was stipulated that they had the right severally to designate the chair or purpose to which the subscription should be applied. The articles expressly prohibited a diversion of money or other thing subscribed specially for a particular purpose to a different one. In casting about for a location for the school, Richmond was finally selected. The citizens of that town and the county of Madison were liberal in their donations, which doubtless controlled the selection. Among them Mr. S. P. Walters (husband of Ann W. Walters) was conspicuous as one of the most generous. He was a devoted member of the church, and, as is shown by his contributions, a no less ardent friend of its educational interests. He subscribed first and last $26,000 toward the endowment of the university. Eighteen thousand dollars of that sum had been given unconditionally. After the death of his son, Henry Bell Walters, he gave $8,000 more; the whole of his subscription to be dedicated to founding and maintaining a chair in the university, to be called the "Henry Bell Walters Professorship of Mathematics." He contemplated adding $4,000 more to this endowment, but died before it was done. After his death his widow, Ann W. Walters, who was also a member of that church residing at Richmond, to carry out her late husband's wishes (which were in accord with her own), to raise the endowment of the Henry Bell Walters Chair of Mathematics to $30,000, executed her note to the university for $4,000. The note is as follows: "Richmond, Ky., March 29th, 1886. Feeling a deep interest in Christian education, and especially in the education of young men for the gospel ministry, I promise to

pay to the order of the board of curators of the Central University of Kentucky the sum of four thousand dollars ($4,000 to be paid at my death; the said curators binding themselves to add this amount ($4,000) to the sum of $26,000, contributed by my late husband, S. P. Walters, for the endowment of the Henry Bell Walters Professorship of Mathematics in said university. Ann W. Walters.''

In 1901 the financial condition of the Central University was far from promising. Indeed, in the opinion of its managers and most interested friends, it was believed to be unable to accomplish, with the income it was receiving and with the constituency back of it, the purpose for which it was established. Its failure was contemplated as a probability, unless new ways and means of support could be supplied. Negotiations between Central University and Centre College were opened, resulting in an agreement for their consolidation. The agreement was submitted to the synods of the respective churches, and approved, and was finally executed in form by the official boards of the two institutions, so as to comply with the requirements of Kentucky Statutes concerning consolidation of corporations. The title of the new corporation is ''Central University of Kentucky.'' The articles of consolidation provide: ''Said Central University of Kentucky shall be vested with and own all property, business, credits, assets, and effects of said constituent corporations without further deed of transfer, and shall be bound for all the contracts and liabilities of each of the constituent corporations. * * * This transfer and conveyance are made subject to the trust herein declared respecting particular property. The object and pur-

pose of said Central University of Kentucky shall be the establishment of an institution of learning of the highest order, on the university plan. In pursuance of said plan it shall continue the college at Danville for instruction in literature and in the arts and sciences, the same to be known as the Centre College of Kentucky. It shall likewise continue, so long as same may be expedient, the schools or departments of medicine and dentistry herein mentioned and already established by Central University at Louisville, Ky., and the department of law established by Centre College at Danville. * * * (7) All property and funds which have been donated or contributed to either of said constituent corporations for the support or maintenance of special chairs or schools, or for any specific purpose, shall be held by said Central University of Kentucky, and dedicated to and used for such specific purpose, in accordance with the terms of the gift or contract under which the same shall have been received.'' The management and control of the new institution was vested by the articles of consolidation in a board of trustees, consisting of an even number of persons, one-half to be selected by the Synod of Kentucky of the Northern Presbyterian Church, and the other half by the Synod of Kentucky of the Southern Presbyterian Church.

· This consoldation having been effected, it is conceded that the school formerly taught at Richmond under the auspices of old Central University, has been discontinued, but that the new institution has conducted and is conducting the school at Danville upon the lines indicated in the new charter, at which is maintained a chair of mathematics known as the ''Henry Bell Walters Professorship of Mathe-

matics.". After the consolidation had been consum-
mated in 1901, Mrs. Ann W. Walters brought this
suit against Central University of Kentucky to can-
cel the $4,000 note set out above. She alleged that
the consideration for which it had been executed had
failed; that the payee thereof, the Central University
of Kentucky, had voluntarily surrendered its charter.
abandoned its purpose of conducting the school there-
in required, and was therefore unable to maintain
the chair for which the subscription had been made.
It is also claimed that the note was voluntary, and
that the maker had revoked it as an executory
promise to give money. The answer, in connection
with the petition, set up the facts above recited. A
demurrer was sustained to the answer, and the note
canceled. While the circuit court rested its judg-
ment upon the ground that the payee corporation
had ceased to exist, and was therefore incapable. of
executing its part of the undertaking, implied as well
as expresed in the obligation, we have concluded, in
view of the importance of the question raised, to ex-
amine that and the other grounds advanced by appel-
lee on the argument upon which it is claimed the obli-
gation is enforceable by appellant.

The first question argued in briefs is that of the
jurisdiction of the Madison Circuit Court over the
person of the appellant in this action. But that ques-
tion we understand to have been waived by appellant
upon the argument at the bar, and is consequently
passed over by the court. The two original corpora-
tions were each creatures of the State, and, so far,
at least, as the Central University was concerned,
took the powers granted subject to the reserved right
in the State, under the general statute of 1856, to alter,

amend, or repel the charter as the State might deem expedient. All who became members of the corporation, as well as those who bestowed benefactions upon it to enable it to comply with the purposes, were bound to take notice of the State's reserved power of altering or revoking the charter. Whether that right extended so far as to change the object of the incorporation without the consent of those whose means had founded it, and to whom it belonged, is a question not presented in this case. The object of the incorporation was to found and foster an institution of higher education, along university lines, to be conducted directly under the influence of the governing body of the Southern Presbyterian Church in Kentucky. Neither the particular means of executing the undertaking, nor the particular place or places at which it was to be done, are provided for in the original articles, so as to be unalterable either by the Legislature, or by the constituent owners of the institution, if permitted by the State. As stated, there are no stockholders having beneficial interest in the concern in the nature of contracts or corporate liabilities. The electorate body, who were to choose the curators or governing body of the university, were themselves but representatives of ultimate interests—those of the adherents of the faith which that church stood for. That church as a body, then, must decide upon matters of polity and internal government of the educational corporation owned by it, not inconsistent with the charter itself. Such matters clearly included location of buildings, the name of the institution, and the providing of means to execute its great purpose. Donors to the enterprise, whose gifts had been unconditional, or had attached conditions not affected by

the matter of location or particular form of government, had not the legal right to control the polity of the institution; nor had they the right, save as one might be an alumnus or a curator, to a voice in determining such questions. Such either were solely for the corporation, acting through its constituents, the church as a body, the alumni body, and the board of curators, on the one side, and the State, on the other.

When the State, by the general law enacted in 1893, provided for the consolidation of corporations in this State, the statute became as it were a part of the charter of the Central University, as if written therein originally. We do not mean to go further here than to decide the precise question presented, which is the power of the corporation to consolidate with another corporation having the same end to accomplish and using substantially the same means to accomplish it. So long as the consolidated corporation undertook to do the thing originally undertaken by its constituents, we hold that the purpose of the original incorporators and of those whose means set the thing on foot was not being diverted. The only matter altered was the means by which it was to be accomplished. The statute (Carroll's Ky. St. 1903, section 555) provides: "Any two or more corporations organized under this chapter or under the law of this State, may consolidate into a single corporation." This power of consolidation is conferred in amplest terms. It is not confined to any class of corporations. Though it will not include those public service corporations, prohibited from consolidating by section 201 of the Constitution, nor the consolidation of any corporations the effect of which would be

to create a monopoly or trust prohibited by sections 3915-3919, Ky. St. 1903, corporations created for educational purposes are clearly included by the terms of the statute, and may, if desired by them, lawfully consolidate. While parts of the section may be inapplicable, as where consent of a certain per cent. of the stockholders is to be obtained and where there are no stockholders, still the section clearly discloses that the course to be pursued is, after the assent 'of the respective corporations is obtained, that the articles of consolidation shall be executed by the directors or governing bodies of the corporations respectively.

The donors to the corporation, who have given money or property to found it, are in no sense a part of the corporation, unless they have become members of its alumni association. It is not contended that Mrs. Walters was such member. When, therefore, the corporation assented to the consolidation, and its directors—that is, its board of curators—executed the articles, the consolidation was effectual to pass its property and franchises to the new concern, as if they had been originally granted to it. It is said this was in the nature of a new grant by the State, and not a continuing of the original grant, because the State only can grant corporate powers and create corporate existence. The fact is that the State had already granted the identical powers to the two corporations. By the new statute it empowered them to consolidate their property and combine their efforts and resources; the State continuing the old separate existence in the new, so far as franchises and property rights were concerned. While the statute provides that the old corporations shall cease to exist upon such consolidation, it was never intended to destroy

anything except the separate identity, the shell, as it were, preserving, however, all that was vital or valuable. The object was, not to destroy, but to preserve and enlarge. The result is amalgamation, not annihilation.

Some courts, construing somewhat similar statutes, have noticed a distinction between consolidation and merger; the former term being used to describe the result of two corporations being combined into a new one, and the latter to describe the result where one corporation absorbs another. As corporate franchises are generally deemed unassignable without permission of the State, a merger is, after all, under our statute at least, a consolidation; for, although the old name of one may be retained and the other dropped, still the course to be pursued under the statute for one corporation to acquire the property and franchises of another is precisely the same as if an entirely new name were adopted. The result is a merging of corporate property and constituents, as where two streams flow together. At the junction they may be said to constitute a new stream, but essentially the latter takes in and is made up of all that formerly flowed in and now flows out of the two from which it gets is being. To use another figure, it is a marriage of two, in which neither is lost, but in which the two are blended into one in contemplation of law. The original existence is merely a legal status. It is not a thing at all. The power that gave it its so-called existence is competent to change it into a new being, with all the rights and attributes of the old. No physical phenomenon is involved. The legislative purpose, and the practical application of it, will not stagger in execution at an imaginary difficulty in

harmonizing a thing dead with a thing which is alive. We are of opinion, and hold, that the effect of the consolidation was to continue in the new corporation, Central University of Kentucky, all the franchises, and vest in it all the property rights, subject to the terms upon which it was acquired, of the two constituent corporations, the Central University of Kentucky and Centre College of Kentucky. This carried over to appellant all notes and other property owned by those two corporations, which included the note forming the subject of this suit.

The questions now recur, was there a sufficient consideration? And, if so, has it failed? One promise may be a valuable consideration to support another. Where the payee of a note promises, in consideration of its payment according to its terms, to do something that he otherwise was not bound to do, the undertaking is mutual, and this mutuality is a sufficient basis for enforcing the obligation against either party who may become derelict. Under the charter of the Central University, as well as under the charter of appellant, the university is bound to apply donations made for a particular purpose to that purpose alone. In the note in question it is stated, in addition, that the payee will apply it to the maintenance of the Henry Bell Walters Chair of Mathematics. Appellant was bound, upon accepting the note with that condition, to apply it to that purpose, and in addition is obligated by such acceptance to maintain perpetually, or so long as that fund will sustain it, a chair of that name in its university. Collier v. Baptist Educational Society, 8 B. Mon. 68; Carr's Exr's v. Robinson, 8 Bush, 269.

But it is most earnestly insisted that the real con-

sideration of the note has failed, irrespective of the legal effect of the consolidation of the colleges under the statute. The argument runs thus: Mrs. Walters and her husband were not only Southern Presbyterians, hostile in feeling toward the Northern Church, cherishing resentment at having been deprived of participation in the control of church property, at least of some part of it, by the dominant branch but they, being citizens of Richmond, contemplated that their benefactions, while going primarily to an institution of their own church, should incidentally aid the city of their home; that, therefore, it was never contemplated by them that any part of their subscriptions should be applied to an institution partly under the control of those whom they had come to regard as antagonists, and to build up a rival community at the expense of their home town. We suspect that the premises are largely imaginary. The record at least does not sufficiently show their existence. Be that as it may, the object in the minds of both parties at the time the subscription in question was made forms its consideration, without regard to the changed views of the promisor, undergone since the obligation was delivered. While the consideration of a note may be proved, though not stated nor alleged, or may be disproven, though stated in the note (section 470, Ky. St. 1903), undisclosed intention and purpose, indulged by one party and not known to the other, could never be the consideration, although they might be the motive for the execution of a note. The consideration of this note is stated on its face. It is consistent with the spirit of the enterprise to which it was a subscription, and it is in accord with the terms of the charter of the payee. It was in aid

of the main purpose as expressed in the memorial of
the alumni, delivered in 1872, to carry out the wishes
of the fathers, as demonstrated by the establishment
of Centre College, now lost to this church.'' It was
not true that Centre College had ever belonged exclu-
sively to those who constituted the Southern Church.
Centre College was the educational idea of Kentucky
Presbyterians.  Southern Presbyterians had lost, at
least for a time, the privilege of utilizing it as a sec-
tarian  institution,  and  they ·purposed  to  pro-
vide themselves with one similar.  Having in view
precisely the same object, it would be harsh and un-
christian to suppose that these differing churchmen
neither hoped nor desired reconciliation.  At any rate,
Mrs. Walters attached no such condition to her note
as looked to its being unenforcable should old Centre
College, ''founded by the fathers of the church,'' be re-
gained by her sect.  On the contrary, the real consider-
ation was the propagation of Christian education; the
means were to be·such as might be applied by her
church; the particular application of her subscription
was to maintain a chair of mathematics, which was to
bear the name of the obligor's son, and which was to
be maintained in the church's educational institution,
then Central University.  While she might have con-
ditioned her promise that the college seat should be at
Richmond, she did not.  That she supposed it would
be continued there, because it was there at the time
the note was executed, did not at all affect the title of
the promise nor the obligatory force of the note upon
.her, in the absence of such condition, assented to by
both parties when the note was executed.  Bryan v.
Millersburg College, 90 Ky. 325, 13 S. W. 276; Penn-

sylvania College Cases, 13 Wall.   (U. S.) 190, 20 L.
Ed. 550.

As there is nothing in the note, or in the contem-
poraneous transaction, binding the payee to apply the
money otherwise than in the maintenance of a chair
of mathematics in its university, being conducted for
Christian education, there was no limitation upon the
power of the payee to change the location of its school
or schools, or to change the manner of their govern-
ment, or the adoption of particular means of effect-
uating the general purpose for which the institution
was founded.   The very nature of the enterprise, on
the contrary, looked to improvement. It contemplated,
by every reasonable implication, that new methods,
new people, even new ideas, would be employed, when
approved by the governing body of the institution. A
college means, or ought to mean, growth; the elimi-
nation of the false; the fostering of the true.   As it is
expected to be perpetual in its service, it must con-
form to the changed condition of each new generation,
possessing an elasticity of scope and work commensu-
rate with the changing requirements of the times
which it serves.   For the past to bind it to unchange-
ableness would be to prevent growth, applying the
treatment to the head that the Chinese do to the feet.
Presbyterians as a body have always been noted as
patrons of education.   This characteristic, shared sig-
nally by the Walterses, will not, upon mere conjec-
ture, be restricted into the unnatural, self-destructive
channel now contended for by appellees.   Their sub-
scriptions to this college, in the absence of some limi-
tation in the agreement, must be conclusively deemed
to have been in accord with the general purpose of the
educational movement then udertaken by the body

of the church, and necessarily subject to the power of the governing constituency of the institution to conform its course and adopt such means to the accomplishment of its great purpose, as are not inconsistent with its object or with the charter granted by the State. So, when the governing body and all the constituents of the corporation have decided to change the location of the university, to include a broader field of work, to add new forces and bring to its aid additional endowment, all tending to the same end contemplated in its establishment, the enterprise is not abandoned, but is continued; and subscriptions made to it are enforceable, whether their consideration is the maintenance of the original institution or particular chairs therein, if such chairs are in fact maintained by the new institution. This is in no sense an application of the cy-pres doctrine; the substitution by the court of an equivalent for the charitable use selected by the donor. The finding is, on the contrary, that the original object still exists and is being conducted to all intents and purposes as contemplated by the donor and the trustees. Therefore there is not a failure of the consideration of the note sued on.

Wherefore the judgment of the circuit court is reversed, and cause remanded, with directions to overrule the demurrer to the answer, and for further proceedings not inconsistent herewith.