59 N.J. Super. 46 (1960)
157 A.2d 136
TOWNSHIP OF PRINCETON, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY IN THE COUNTY OF MERCER, APPELLANT,
v.
INSTITUTE FOR ADVANCED STUDY, A CORPORATION OF THE STATE OF NEW JERSEY, AND THE DIVISION OF TAX APPEALS, DEPARTMENT OF THE TREASURY, STATE OF NEW JERSEY, RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued September 28, 1959.
Decided January 4, 1960.
*48 Before Judges GOLDMANN, FREUND and HANEMAN.
Mr. Gordon D. Griffin argued the cause for appellant.
Mr. Henry M. Stratton, II, argued the cause for respondent Institute for Advanced Study (Messrs. Smith, Stratton & Wise, attorneys).
Mr. Murry Brochin, Deputy Attorney General, filed a statement in lieu of brief (Mr. David D. Furman, Attorney General, attorney for respondent Division of Tax Appeals).
*49 The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Princeton Township appeals from a judgment of the Division of Tax Appeals exempting from local property taxation Olden Manor, the official residence of the Director of the Institute for Advanced Study ("Institute").
The township had assessed the residence, the land on which it was erected, and personal property located therein, at $105,900 for the year 1957, without granting the exemption claimed by the Institute under N.J.S.A. 54:4-3.6, which reads in part as follows:
"The following property shall be exempt from taxation under this chapter: All buildings actually used for colleges, schools, academies or seminaries; * * * all buildings actually and exclusively used in the work of associations and corporations organized exclusively for the moral and mental improvement of men, women and children, or for religious, charitable or hospital purposes, or for one or more such purposes; * * *."
On appeal, the Mercer County Board of Taxation affirmed the assessment. On further appeal, the State Division of Tax Appeals concluded that the Legislature did not intend to limit the application of the words "colleges, schools, academies or seminaries" only to institutions offering "the more orthodox or traditional methods of instruction." It held that the Institute is a college within the meaning of N.J.S.A. 54:4-3.6 and that Olden Manor is actually used for college purposes. The Division thereupon cancelled the assessment with respect to Olden Manor and the land surrounding it not in excess of five acres. This appeal followed.
The Institute, officially known as the Institute for Advanced Study  Louis Bamberger and Mrs. Felix Fuld Foundation, is a non-profit corporation of New Jersey, organized under the provisions of R.S. 15:1-1 et seq., as amended, for the purpose of "the establishment * * * of an institute for advanced study, and for the promotion of knowledge in all fields, and for the training of advanced students and workers for and beyond the degree of Doctor *50 of Philosophy and other professional degrees of equal standing." Its activities and operations are conducted and controlled by a board of trustees, elected as provided in the by-laws, and acting through the director, who is the chief administrative and executive officer. Among the powers of the corporation under its certificate of incorporation is the power
"* * * to make, amend, alter and repeal rules and regulations for the government of the institute to be established, maintained and conducted by the corporation, and in respect to the appointment and duties of executive officers and members of the staff and faculty, and in respect to the admission (with and/or without payment of dues or charges) and discipline of the students and workers, and in respect to the granting of diplomas and the awarding of degrees (including honorary degrees); * * *."
The Institute has 22 permanent faculty members and a transient student body, designated as members (these might in other institutions be called graduate or post-doctoral students), of about 125. Most of the student-members are admitted to the Institute upon application; a few are individually invited by the faculty to attend. Most of them are on leave of absence from other educational institutions, and come to the institute for a term or two, or sometimes for as much as two years, to pursue their respective fields of study or research. No tuition is charged, operations being financed for the most part from the income of the substantial endowment created by Louis Bamberger and his sister, Mrs. Felix Fuld (the Bamberger-Fuld Trust), with subsidiary grants from the Rockefeller, Carnegie, Ford and the National Science Foundations.
The Institute has three disciplines  mathematics, physics and historical studies. They meet as schools, and they conduct the business of the Institute as a body under the chairmanship of the Director. There is no formal instruction. However, seminars are scheduled weekly, or even more frequently. Student members are furnished office space and secretarial help, and are free to pursue their own research, *51 with no commitment whatsoever that it be along a given line or that the results accrue to the institution. Although the Institute has the corporate power to grant diplomas and award degrees, there are no degrees because the members are all at the post-doctorate level when they arrive, and already have their highest degree.
Olden Manor is a substantial dwelling owned and maintained by the Institute and located on its main campus on Olden Lane in Princeton Township. It is the principal residence of the Director and his family, to whom it is furnished rent-free and as a term of his employment. It is also used by the Director, on behalf of the Institute, for official entertainment and for numerous faculty and trustees' meetings and conferences.
The founder and first director of the Institute was Dr. Abraham Flexner. His vision of "a paradise for scholars," where "scholars and scientists may regard the world and its phenomena as their laboratory," led to the establishment of the Institute through the munificent gift of Mr. Bamberger and his sister in 1930. The Institute was cast in the image of his ideal as a small center where the quality of work rather than the number of students would be the distinguishing characteristic  a place where scholars and scientists could dedicate themselves to the conservation of knowledge and ideas, the interpretation of such knowledge and ideas, and the search for truth  in short, pure learning for its own sake. After nine years Dr. Flexner was succeeded by the distinguished educator, Dr. Frank Aydelotte, and then by the eminent physicist, Dr. Robert Oppenheimer. Among the many renowned scholars who have worked at the Institute are Albert Einstein, T.S. Eliot, John von Neumann, Reinhold Niebuhr, Edwin Panofsky, Herman Weyl, Arnold Toynbee, C.N. Yang, George F. Kennan and Dr. Oppenheimer.
We are concerned here with only the first clause of N.J.S.A. 54:4-3.6, exempting from taxation all buildings actually used for colleges, schools, academies or seminaries. The *52 subsequent portion of the statute quoted above is not involved on this appeal; the Institute concedes that although Olden Manor is actually used in connection with its activities and programs, it is not "exclusively" so used.
The Township contends that the Institute is not entitled to tax exemption under the statute because it lacks the usual indicia of a college, school, academy or seminary; "it has neither teachers nor pupils, in the ordinary sense, since it offers no curricula or instruction; it does not prepare its students for undergraduate or postgraduate academic degrees, since its members are on the post-doctoral level and no degrees are awarded; it imposes no discipline, since its keynote is unlimited individual freedom, unencumbered by institutional requirements." However, it readily concedes that the Institute is a unique development in American education; counsel describes it as "a constellation of brilliant men whose sole occupation is thinking and whose frontier is `the growing tip of civilization.' * * * It is the epitome of the contemplative method and pure research." Nonetheless  so runs the argument  it does not fairly fall within the statutory intendment of a college or school.
We are not persuaded that "college," as used in the statute, is to be confined to the kind of institution that has become so familiar to us, where there are teachers and pupils, courses of instruction, a conferring of degrees, and an extended discipline. The concept of a college is an organic one, taking on a varying aspect in different times and places. See, for example, Burns B. Young, "What is a College?" in 30 The Educational Record 385 et seq. (October 1949), and see also Yale University v. New Haven, 71 Conn. 316, 42 A. 87, 43 L.R.A. 490 (Sup. Ct. Err. 1898).
In its earliest and most fundamental sense it meant a collection of persons united by the same office, interest or occupation  the Roman collegium. Among the many definitions of "college" given in the New Oxford English Dictionary on Historical Principles (1893), we find
*53 "1. An organized society of persons performing certain common functions and possessing special rights and privileges; a body of colleagues * * *.
4. A society of scholars incorporated within, or in connexion with, a university, or otherwise formed for purposes of study or instruction. * * *."
The Cyclopedia of Education (1911), in its discussion of "college," while indicating the more limited sense of the word, exposes its larger meaning:
"One of the many terms for a society or body of persons associated together for promotion of a common purpose which, originally general and applicable to any such body, has become restricted to a particular kind of body; viz., one for the purpose of secondary or higher education."
Webster's New International Dictionary (2d ed., unabridged, 1958) defines "college" as "a society of scholars or friends of learning, incorporated for study or instruction, especially in the higher branches of knowledge."
We do not understand "college" to be a word of art which, by universal understanding, has acquired a definite, unchanging significance in the field of education, fixed forever in its meaning like a bug in amber. The meaning of collegium it originally held has persisted through the ages, now in the mold of the Akademeia of Plato (e.g., the Academy at Florence, founded by Cosimo de Medici in 1474, or the French Academy, established by Louis XIV and chartered in 1635  associations of scholars for investigation into the humanities); again in the form of the Institute (e.g., the Institut National des Sciences et des Arts, established in France in 1795; the American Law Institute, founded in 1923).
Is the Institute to be barred from exemption from taxation of a component building because the members, already possessing doctorate degrees, cannot receive further academic honors? Or because the illustrious few scholars who are chosen to study there are deemed to profit most by introspective *54 and individual research, rather than by instruction in the more usual teacher-pupil relationship? Is exemption to be denied merely because discipline, in the strict sense of the word, is kept at a minimum because of the very quality of those constituting the Institute and their particular and individualized pursuit of knowledge and ideas? To do so is to impose an arbitrary limitation on the legislative intent, to ignore the clearly discernible evolution in modern-day higher education toward less formal instruction, with greater emphasis on individual study and creative research  a development which has arrived at its greatest refinement in the activities of the Institute.
A college, in whatever mold it be cast, is expected to be perpetual in its service and undeviating in its ultimate purpose, which is the elimination of the false and the fostering of the true. There must of necessity be a flexibility of form and approach if this goal is even to be approximated. As was said in a different context by the Kentucky Court of Appeals, "For the past to bind [the college] to unchangeableness would be to prevent growth, applying the treatment to the head that the Chinese [used to] do to the feet." Central Univ. of Kentucky v. Walters' Ex'rs, 122 Ky. 65, 90 S.W. 1066 (1906). The challenge of the times must evoke a reasoned response, else the search for the truth suffers. This, basically, was the idea underlying Dr. Flexner's vision of an institute like the one he raised up at Princeton.
As we have observed, the powers of the Institute include the power to make rules and regulations for its government and with respect to the appointment and duties of its members, admission with or without payment of dues or charges, discipline, and the granting of such diplomas and the awarding of such degrees, including honorary degrees, as the corporation might decide upon. If instruction be a determinant, we must consider instruction in its broadest sense and as inclusive of self-instruction and the benefits scholars derive, one from the other, in daily association at a place like the Institute and in their frequent seminars.
*55 While the Institute is unique, occupying as it does an unexampled position on the farthest frontier of American education, it surely possesses every attribute of an institution of learning. It fits well within the frame of those institutions which, for over a century (see L. 1851, p. 271, § 5(II)), have been the particular concern of the Legislature in extending tax benefits to colleges, schools, academies and seminaries, thereby encouraging the cause of education and research. It is reasonable, if not indeed compelling, that this court give effect to the obvious purpose of the Legislature. To that end the word "college" may be given an expanded interpretation comporting with the manifest reason and obvious purpose of the law. The spirit of the legislative direction must prevail over any literal or conventional sense of the term. Cf. New Capitol Bar & Grill Corp., v. Division of Employment Security, 25 N.J. 155, 160 (1957).
Although in no way dispositive of the question here involved, it is not inappropriate to note that shortly after the Institute was founded the Treasury Department ruled that it was entitled to exemption from federal income tax under section 103(6) of the Revenue Act of 1928. And in 1939 that part of the property of the Institute lying in the Borough of Princeton, immediately adjacent to the 59 acres of Olden Manor in the township, was declared tax-exempt by the then State Board of Tax Appeals. Institute for Advanced Study, etc. v. Princeton Borough, New Jersey Tax Reports 1934-1939, p. 640.
Mention might also be made of N.J.S.A. 54:34-4(d), granting exemption from transfer inheritance tax of that part of a decedent's estate which passes to or for the use of any educational institution not operated for profit. In the statement appended to the legislative bill underlying the statute (Senate 256 of the 1948 Legislature, which became L. 1948, c. 268), the Institute was listed along with Princeton University, Rutgers University, Drew University, Seton Hall College, Upsala College, and other colleges of the State, as potential beneficiaries. While this would seem to offer some *56 evidence of legislative recognition that the Institute is of at least as high a calibre as the other named institutions, the township observes that the words "educational institution" are somewhat broader than "colleges, schools, academies or seminaries," and that it would not be correct to permit the provisions of the Transfer Inheritance Tax Act to permeate the General Tax Act by a kind of osmosis. True, "educational institution" embraces the whole range of places of learning. And yet, the legislative statement is not without significance, for the Legislature thereby showed it was willing to extend exemption to the Institute on the same basis as Princeton, Rutgers and other institutions of knowledge generally known as colleges or universities, thereby recognizing its true character in the educational setting of the twentieth century.
We conclude that to deny exemption in this case to an institution which stands at the very apex of American higher education, one which has attracted to Princeton some of the finest minds of our generation, would be a perversion of the legislative intention expressed in the first clause of N.J.S.A. 54:4-3.6.
The township does not contend that Olden Manor is not actually used (as was fully established in the record) in the work of the Institute and therefore not entitled to tax exemption  once it is decided that the Institute falls within the category of "colleges, schools, academies or seminaries." We have so concluded. The proposition that a residence like Olden Manor is tax-exempt has been established since State v. Ross, 24 N.J.L. 497 (Sup. Ct. 1854), decided soon after the passage of the 1851 tax exemption law. See also, Rutgers College v. Piscataway Township, 20 N.J. Misc. 127 (State Bd. of Tax App. 1942), affirmed sub nom. Piscataway Township v. State Board of Tax Appeals, 129 N.J.L. 261 (Sup. Ct. 1942), affirmed per curiam, 131 N.J.L. 158 (E. & A. 1944).
Affirmed.