665 A.2d 1128

NEW JERSEY CARPENTERS APPRENTICE TRAINING AND EDU-CATION FUND, PLAINTIFF–APPELLANT, v. BOROUGH OF KENILWORTH, NEW JERSEY, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Submitted September 12, 1995—Decided October 16, 1995.

Before Judges PRESSLER, WEFING and ARIEL A. RODRÍGUEZ.

*Oransky, Scaraggi, Borg & Abbamonte,* attorneys for appellant (*Andrew D. Borg,* on the brief).

*Palumbo & Renaud,* attorneys for respondent (*Robert F. Renaud,* on the brief).

The opinion of the court was delivered by

WEFING, J.A.D.

The plaintiff, the New Jersey Carpenters Apprentice Training and Education Fund (Fund), appeals from an Order of the Tax Court entered September 29, 1994 that affirmed the real estate tax assessment for property in Kenilworth owned by the Fund.

The Fund was created under a deed of trust dated November 1, 1969 between the New Jersey State Council of Carpenters, an unincorporated association of trade union and district councils affiliated with the United Brotherhood of Carpenters and Joiners of America, and the Building Contractors Association of New Jersey, an association of employers in the building construction industry.

The trust is managed by a board of trustees, whose membership is composed equally of representatives from labor and from management. The purpose of the trust is to provide free instruction and training to individuals who are working as apprentices and wish to become journeymen carpenters. It provides one hundred sixty hours of instruction in various aspects of the carpentry trade over a four-year period. When a student completes the program, the student receives a journeyman's certificate from the United States Department of Labor and the Union. There is no requirement that students be union members or related to union members although it is expected that those who complete the program will become union members. The program has no restrictions in terms of race, color or sex. Students are recruited from the public at large; they are required only to have either a high school diploma or an equivalency degree.

The program itself is funded primarily through wage deductions. An employer is required, under collective bargaining agreements, to deduct one percent of a union employee's wages and forward that to the Fund. The Fund thus has two sources of income: the funds generated through payroll deductions and any interest income it may generate. The Fund itself is exempt from the payment of federal income tax under § 501 of the Internal Revenue Code.

In April 1990, the Fund purchased property located at 221 South 31st Street in Kenilworth to house its training programs for the northern part of the State. It also operates an instructional training program in Vineland for individuals in the southern part of the State. The Kenilworth premises are used only for the

instruction and training programs; no other activities are conducted there. Prior to purchasing the Kenilworth property, the Fund conducted its programs in the evening using the facilities of the Middlesex County vocational schools.

The Fund applied to the tax assessor of Kenilworth for an exemption from real property taxes pursuant to *N.J.S.A.* 54:4-3.6. When that was denied, the Fund appealed to the Union County Board of Taxation which upheld the assessor. It then filed a complaint with the Tax Court seeking a declaration that its property was exempt from real estate taxes. The Tax Court denied the exemption as well and affirmed the local property tax assessment. Plaintiff has appealed to this court and we reverse.

*N.J.S.A.* 54:4-3.6 exempts from real estate taxation "all buildings actually used for colleges, schools, academies or seminaries ... or the lands on which they stand." In its oral opinion, the Tax Court noted several factors to support its conclusion that the apprentice training program in Kenilworth did not qualify for tax exemption as a school. It noted that the trust instrument itself was revocable and that it was not free from self-interest since it was designed to provide workers for the building contractors and members for the union. This, it concluded, represented benefits flowing "to a profit-making segment of society." It concluded there was a lack of public benefit that a governmental entity would otherwise have had to provide.

In addition, the Tax Court was clearly troubled by the net assets of the Fund shown on the Fund's 1991 Form 990 ($9,331,-441) and by the amount of the salaries of the administrative and instructional staff. It was also dissatisfied with the provisions within the trust instrument for disbursement of trust funds in the event of dissolution.

In reaching its conclusion about a lack of public benefit, the Tax Court judge relied upon *Kimberley Sch. v. Town of Montclair*, 2 *N.J.* 28, 65 *A.*2d 500 (1949). We are satisfied that that case does not lead to the conclusion that plaintiff's property should be subject to real estate taxation.

■ We recognize, of course, that *N.J.S.A.* 54:4-3.6 should be strictly construed, for the effect of granting an exemption from property taxes is merely to shift the tax burden onto remaining taxpayers. *West Orange Tp. v. Joseph Kushner Hebrew Academy,* 13 *N.J.Tax* 48, 52 (1993). We further recognize as settled that the entity claiming the exemption has the burden of proving it is entitled to it. *Presbyterian Homes v. Division of Tax Appeals,* 55 *N.J.* 275, 283, 261 *A.*2d 143 (1970).

One of the theoretical underpinnings of real property tax exemptions is referred to as the doctrine of *quid pro quo.* It has been set forth in the following manner:

> Exemptions from the burdens of taxation, which the great masses of the people are called upon to sustain, as a requisite of civil government, are only favored in legislation, upon the theory that the concession is due as *quid pro quo* for the performance of a service essentially public, and which the state thereby is relieved *pro tanto* from the necessity of performing, such as works of charity and education, freely and charitably bestowed, as evidenced by the legislation under consideration. Without that concurring prerequisite, an exemption becomes essentially a gift of public funds at the expense of the taxpayer, and indefensible both under our public policy of equal taxation and our constitutional safeguard against illegal taxation.
>
> [*Carteret Academy v. State Board,* 102 *N.J.L.* 525, 528-529, 133 *A.* 886 (Sup.Ct. 1926), *aff'd o.b.* 104 *N.J.L.* 165, 138 *A.* 919 (E. & A.1927).]

It was to this principle of *quid pro quo* that the Tax Court was referring when it determined that the Fund was not providing a public benefit that a governmental entity would otherwise have had to supply.

The limitations on this principle, however, were clearly set forth by Chief Justice Vanderbilt in *Kimberley School v. Town of Montclair,* where he wrote:

> The term *quid pro quo* implies a quantitative exactness that cannot possibly be applied in measuring the benefits to the public from the existence of educational institutions. It erroneously suggests that the benefit is confined to the municipality in which the school is located, whereas in fact the advantages of educational institutions are not confined to the respective localities in which they are situated. Undeniably it is the public benefit resulting from education that justifies granting schools and colleges exemption from taxation, but such benefit cannot be exactly admeasured either on the part of the schools or of the public.
>
> [*Kimberley, supra,* 2 *N.J.* at 42, 65 *A.*2d 500.]

■ We think it is beyond doubt that the public benefits by the training programs provided by the Fund. It is clearly to the benefit of the public to have a pool of skilled, well-trained carpenters available. Our Legislature has long recognized the benefits that flow to the public from providing adequate vocational training. See, e.g., *N.J.S.A.* 18A:54–1 *et seq.; N.J.S.A.* 34:1A–36 *et seq.*

The training and the courses provided by the Fund are available without cost to the students, who numbered more than 600 in 1994. These students, most of whom are working as apprentices, pay nothing for books, enrollment, registration, materials or supplies. Everything is free to them. Students are graded upon their work and if it is unsatisfactory, they do not progress and do not receive the certificate of completion. That the training program may also supply contractors with employees and the union with members is, to our mind, ancillary to the even greater public benefit of providing training in a skilled trade to those who seek it.

■ A school includes "an institution for instruction in a particular skill or field." *Random House Unabridged Dictionary* 1715 (2nd ed., 1993). We are satisfied that the instructional training program for journeymen carpenters conducted by the Fund qualifies as a school.

The Tax Court was clearly troubled by the salary levels of the administrative and instructional staff. The testimony was unrefuted, however, that the salaries were based on union pay scales. It is unrealistic to expect that individuals would be willing to serve in these positions if it meant a significant reduction in what they could otherwise earn.

The Tax Court was also bothered by the size of the Fund's net assets. It concluded that the fact that payments to the Fund were based on wages, rather than on actual expenses, demonstrated the Fund was intended to make money.

The income of the Fund, however, fluctuates with economic conditions. When the economy deteriorates, fewer carpentry jobs are available and the amount paid to the Fund decreases. We are

unable to conclude the Fund's assets are so disproportionate that it should lose a tax exemption on that basis.

In *Kimberley School v. Town of Montclair,* Justice Vanderbilt said, "Our sole function is to determine on all the facts, present and past, whether the school in question was being run for the purpose of making money." *Kimberley, supra,* 2 *N.J.* at 43, 65 *A.*2d 500. We are satisfied that on the record presented here, the answer to that question is no.

The Tax Court also considered the operation of this training program analogous to that run by the Textile Research Institute in conjunction with Princeton University, which was denied a real property tax exemption in *Textile Research Inst. v. Princeton Tp.,* 35 *N.J.* 218, 172 *A.*2d 417 (1961). Again, we disagree.

The Textile Research Institute was a non-profit corporation; its members were companies "engaged in the production or utilization of textiles, textile supplies, textile raw materials, textile products, textile machinery or equipment, or engaged in the utilization, manipulation of chemical or physical treatment of fibers, or engaged in research or education related to these fields." *Textile Research Inst. v. Princeton Tp., supra,* 35 *N.J.* at 219, 172 *A.*2d 417. Individuals could also become members of the Institute but had no voting privileges. The Institute was governed by a board of trustees who were elected solely by the member companies. It offered fellowships and laboratory facilities to pre-doctoral and post-doctoral students in the textile field through a cooperative arrangement with Princeton University. Pre-doctoral students registered as graduate students at Princeton University. While they took their course work at the University, they conducted their thesis research in the Institute laboratories, supervised by Institute scientists as well as Princeton faculty. Upon completion, they received both a degree from Princeton University and a certificate from the Institute.

The Institute also afforded facilities for post-doctoral fellows to conduct research. In such a situation, member companies, who supported the research, could specify its subject. The Institute

also conducted research by its own staff in areas in which the member companies were interested. The Institute also published the results of its research. Some of the publications were available to the general public and some only to member companies for an initial period of time. In the case of research supported by one member company, the results would be withheld from other members for two years.

After reviewing these factors, the Supreme Court concluded that they "lead to the inescapable conclusion that the Institute is primarily designed to benefit the textile industry." The court thus held that the Institute was not a college for purposes of *N.J.S.A.* 54:4-3.6 and was thus subject to real estate taxation.

In this case, the benefits of the vocational training provided by the Fund extend far beyond the union and the employer. The purpose of the Fund is not to develop newer, more efficient and economic ways to construct a building; it is rather to provide the basic instruction and methodology to allow individuals to pursue a trade when they might not otherwise have the opportunity to do.

Finally, the Tax Court judge relied upon the revocable nature of the Trust Agreement that established the Fund; indeed, she called it "essential" to her decision. Within her oral opinion, she referred to a "lack of certainty that the assets will not pass out to individuals, pass out to (a) profit-making segment of society."

The original deed of Trust, executed in 1969 dealt at several points with the possibility that the Fund might terminate. Section 6 of Article II of the Trust Agreement provided:

The Trustees shall use and apply the property and assets of the Fund only for the following purposes and under no circumstances shall any moneys or assets of the Fund be payable or revert to the Employers or to the Union.

a) To pay or provide for the payment of all reasonable and necessary expenses of collecting the Fund Payments and administering the affairs of the Fund, including, but without limitation, all reasonable expenses which may be incurred in connection with the establishment and maintenance of the Fund, the employment of such administrative, legal, expert and clerical assistance, the leasing or purchase of such premises and of such materials, supplies and equipment as the Trustees, in their discretion, find necessary or appropriate in the performance of their duties.

b) To pay or provide for the payment of Apprentice Training and Educational benefits as may be legal for such Funds and as limited by this Agreement and by the Internal Revenue Code for such exempt trusts.

### Section 2 of Article VII provided:

In the event of termination of the Fund, the Trustees shall apply the Fund to pay or to provide for the payment of any and all obligations of the said Fund and distribute any remaining assets in such manner or will, in their opinion, best effectuate the purposes of this Fund, provided however, that no part of the corpus or income of this Fund shall be used for or diverted to purposes other than Apprentice Training and Educational purposes or set forth in this Agreement or the administrative expenses of this Fund. Under no circumstances shall any of said corpus or income revert to any Employer or Union.

### Finally, Section 4 of Article VIII provided:

Anything contained in this Agreement, or any amendment hereof to the contrary notwithstanding, no part of the corpus or income of the Fund shall be used for, or diverted to, purposes other than Apprentice Training and Educational, (sic) limited however, to the purposes provided for in this Agreement, or the liabilities, including taxes, of the Fund. No part of said corpus or income shall be paid to or revert to any Employer or the Union.

The Trust Agreement has been amended several times; one of the amendments, effective January 1, 1975, followed passage of the Federal Employee Retirement Income Security Act of 1974 (ERISA). Section 9 of that Amendment stated in part "All provisions of the Agreement which are in conflict with the Employee Retirement Income Security Act of 1974 are deleted." Although the transcript is not at all clear, we gather that the Tax Court judge was of the view that this 1975 amendment removed the provisions of the Agreement that would otherwise have prevented distribution of the Fund's assets to the union or employers. We do not consider that general amending language sufficient to deny a property tax exemption to the Fund.

The judgment is reversed.