685 A.2d 1309

NEW JERSEY CARPENTERS APPRENTICE TRAINING AND ED-UCATION FUND, PLAINTIFF–RESPONDENT, v. BOROUGH OF KENILWORTH, NEW JERSEY, DEFENDANT–APPELLANT.

Argued September 10, 1996—Decided December 17, 1996.

172

*Robert F. Renaud* argued the cause for appellant (*Palumbo & Renaud*, attorneys).

*Andrew D. Borg* argued the cause for respondent (*Oransky, Scaraggi, Borg & Abbamonte*, attorneys).

The opinion of the Court was delivered by

GARIBALDI, Justice.

*N.J.S.A.* 54:4–3.6 exempts from real property taxation any building that (1) is actually used as a "school" and (2) is "not conducted for profit." Plaintiff, the New Jersey Carpenters Apprentice Training and Education Fund (Fund), owns a building in which it operates a training center for apprentices. The question to be resolved in this case is whether that building is exempt under *N.J.S.A.* 54:4–3.6.

I

The Fund is a Taft–Hartley trust fund created under an Agreement and Declaration of Trust (Trust) in 1969. The Fund was established "for Apprentice Training and educational purposes." Four parties signed the trust agreement: (1) the New Jersey State Council of Carpenters, an unincorporated association of local trade unions and district councils affiliated with the United Brotherhood of Carpenters and Joiners of America (Union); (2) the Building Contractors Association of New Jersey, an association of employers in the building construction industry; (3) additional employers in the construction industry who are under an obligation to make contributions to the Fund by virtue of their respective collective bargaining agreements with the Union; and (4) the trustees, representatives of both the Union and the employers.

The trustees oversee the Fund's activities and investments. Originally composed of fourteen members, the board has been expanded to twenty-four members. Under the Trust, half of the trustees are appointed by the Union and half by the employers.

The Union trustees serve at the will of the Union and the employer trustees serve at the will of the employers.

The Fund's purpose is described in the Trust:

The Fund is established for Apprentice Training and educational purposes and no part of the earnings or assets of the Fund shall inure to the benefit of any private shareholder or individual or any Employer or Union.

[Trust, Art. II § 4.]

To effectuate that purpose, the Trust provides that the trustees may use the funds and assets only to pay for reasonable expenses and for the payment of "Apprentice Training and Educational benefits" as permitted by the IRS and the Trust. The Fund is exempt from federal income taxes under 26 *U.S.C.A.* § 501(c).

Contributions from Union employees support the Fund. Under collective bargaining agreements, all Union carpenters are obligated to contribute one percent of their wages to the Fund. The assessment is collected through employer-withholdings by those employers who have signed collective bargaining agreements.

The Trust does not grant any express power of revocation to either party, but it terminates "when there is no longer in force a Collective Bargaining Agreement between a single Employer and the Union requiring Fund Payments to the Fund." The parties, therefore, effectively have the power to revoke the Fund if they do not provide for contributions to the Fund in their collective bargaining agreements. However, the Trust does provide that, on termination, "no part of the corpus or income of this Fund shall be used for or diverted to purposes other than Apprentice Training and Educational purposes.... Under no circumstances shall any of said corpus or income revert to any Employer or Union."

The Trust does grant a power of modification to the trustees upon a two-thirds vote of the trustees, but that power is limited:

[N]o amendment shall divert the Funds then constituted or any part thereof, to a purpose other than as set forth in this Agreement, nor permit a return or payment of the assets to the Employers....

[Trust, Art. IX, § 1.]

To comply with the Employee Retirement Income Security Act of 1974, the Trust was amended to provide that "[a]ll provisions of

the Agreement which are in conflict with the Employee Retirement Income Security Act of 1974 are deleted."

To provide a training center for apprentices, the Fund purchased property in Kenilworth for $2.8 million in 1990. The Fund has a similar training center in South Jersey. The premises are used as a training facility for apprentice carpenters. The program is open to anyone, without any requirement of union membership. The only requirement is that students have a high-school diploma or equivalency degree. The Fund recruits apprentices from union locals, by advertising at high-school career days, from vocational schools, and through advertising at unemployment offices. There is no charge for tuition, books, or supplies.

Apprentices are required to work full-time in carpentry and attend the facility four weeks per year, once every thirteen weeks, for a four-year period. In order to become journeymen carpenters, apprentices must complete 160 hours of on-premises training each year over the four-year period. Apprentices who attend the training center are taken into local unions.

The training center is not a traditional school with lectures and classrooms, but instead takes a "hands-on" approach. Students must master several skills in order to become journeyman carpenters. For each skill, students watch a slide show or video. After viewing the slide show, the students attempt the skill. Instructors, who are qualified carpenters and full-time employees of the Fund, are available to answer questions, but they do not teach in a traditional manner. No academic programs are offered. Students do not receive grades, but those who fail a skill are not allowed to proceed to the next level of carpentry and may not receive accompanying raises. Reports on the apprentices are sent to the local unions on a monthly basis. As the Administrative Manager of the Fund testified:

A. Number one, if they don't come to school—we're not—we're not disciplinarians, alright? Their home locals take care of that. We give a report to their local monthly. If they don't complete their blocks or go to school they don't go on to the next level, they won't get a raise. That's how their [sic] basically rated.

. . . .

... You have to complete your 160 hours a year.... And if they don't perform properly, get their hours in or do their work, we send a report to their home local and it's up to them to discipline them.

The school is not accredited by the New Jersey Department of Education, the Middle States Association, or any similar agency. Nor is the program established, maintained, or supervised by the New Jersey Commissioner of Education as required for vocational schools operated by school districts or county vocational school boards.[1] The United States Department of Labor, however, monitors the program, and all those who complete the program are awarded a journeyman's certificate by the Department as well as from the national union's office in Washington.

In 1991, the Fund had nine employees, five administrators and four instructors, although two instructors worked only for part of the year. Generally, the employees were paid and given benefits in accordance with the union scale for a fifty-two-week year. The salaries for full-time employees ranged from $103,726 for the Administrative Manager to $30,379 for the Office Manager. Employees also received benefits packages equal to one-third of their salaries.

As discussed *supra*, the training center is funded by a one-percent assessment on all union wages. Through the years, this amount has exceeded the cost of the program, and the Fund has accumulated a substantial surplus. According to the Fund's 1991 Internal Revenue Service Form 990, the Fund's assets totalled $9,684,000 at the end of 1991. The assets included land, property, and a $5,000,000 reserve fund. In 1991, the surplus grew by approximately $800,000. That year, the Fund obtained $2,350,000 from the wage assessment and $354,000 from investment income,

---

1 *N.J.S.A.* 18A:54–2 provides:

The commissioner shall investigate the necessity for the introduction of vocational education and report thereon, from time to time, to the state board. Subject to the approval of the state board and to such rules as it may make, the commissioner shall superintend the establishment and maintenance of schools for this form of education and supervise and approve such schools as provided in this chapter.

and had costs of $2,000,000. Of the costs, only $754,000 were directly related to program services. The remainder was allocated to management and general expenses, including $230,000 for "contest expenses." The Fund is sufficiently well-off that it bought the $2,800,000 Kenilworth facility without any borrowed funds.

The revenue from the wage assessment fluctuates with the condition of the economy and the amount of wages paid to union carpenters. For example, the amount collected from wages for the four years prior to 1991 fluctuated from a low of $1,468,000 in 1987 to a high of $2,550,000 in 1990. Evidence also showed that the fund collected only $1,500,000 in 1994 because of a weak economy.

In 1991, the Fund applied to defendant, the Borough of Kenilworth, for an exemption from real-estate taxes for the training center pursuant to *N.J.S.A.* 54:4–3.6. The Fund claimed that it was operating a school that was not conducted for profit. Kenilworth denied the exemption. The County Board of Taxation affirmed the assessment. Plaintiff filed a complaint with the Tax Court of New Jersey, which found that the property was neither a school nor nonprofit and entered a judgment affirming the assessment. The Appellate Division reversed the Tax Court's decision. *New Jersey Carpenters Apprentice Training & Educ. Fund v. Borough of Kenilworth,* 284 *N.J.Super.* 521, 665 *A.*2d 1128 (1995). We granted defendant's petition for certification. 143 *N.J.* 329, 670 *A.*2d 1069 (1996).

## II

Tax-exemption statutes are strictly construed against those claiming exemption because of the compelling public policy that all property bear its fair share of the burden of taxation. *Princeton Univ. Press v. Borough of Princeton,* 35 *N.J.* 209, 214, 172 *A.*2d 420 (1961). However, strict construction does not require "a rigid scholastic interpretation. . . . The rule of strict construction must never be allowed to defeat the evident legisla-

tive design." *Boys' Club of Clifton, Inc. v. Township of Jefferson,* 72 *N.J.* 389, 398, 371 *A.*2d 22 (1977) (quoting *Township of Princeton v. Tenacre Found.,* 69 *N.J.Super.* 559, 563, 174 *A.*2d 601 (App.Div.1961)). Nonetheless, taxation is the rule, and the claimant bears the burden of proving an exemption.

The Fund claims an exemption from real-property taxes under *N.J.S.A.* 54:4–3.6 (section 3.6), which states in pertinent part:

> The following property shall be exempt from taxation under this chapter: All buildings actually used for colleges, schools, academies or seminaries[;] ... provided, in case of all the foregoing, the buildings, or the lands on which they stand, or the associations, corporations or institutions using and occupying them as aforesaid, are not conducted for profit. . . .

Thus, under the plain meaning of the statute the Fund will be exempt if it conducts a not-for-profit school.

 The first prong of the statutory test for exemptions requires the training center to be a "school, academy, college or seminary." The Fund contends that it is a school, and the Appellate Division agreed because its definition of "school" included "an institution for instruction in a particular skill or field." *N.J. Carpenters Apprentice Training & Educ. Fund, supra,* 284 *N.J.Super.* at 526, 665 *A.*2d 1128 (citing *Random House Unabridged Dictionary* 1715 (2d ed.1993)). Kenilworth argues that "school" refers only to primary and secondary schools, i.e., the traditional, accredited institution with classrooms and homework, and not a union training facility with hands-on training for adults.

 "Construction of any statute necessarily begins with consideration of its plain language." *Merin v. Maglaki,* 126 *N.J.* 430, 434, 599 *A.*2d 1256 (1992). A statute should be interpreted in accordance with its plain meaning if it is "clear and unambiguous on its face and admits of only one interpretation." *State v. Butler,* 89 *N.J.* 220, 226, 445 *A.*2d 399 (1982). The definitions for "school" do not provide any guidance. "School," as ordinarily used, has two meanings: a broad one, including all institutions of learning, or a more narrow one, including only primary and secondary schools. *See, e.g., Black's Law Dictionary* 1511 (4th Ed.1951) ("An institution or place of learning of a lower grade, below a

college or university. A place of primary instruction. The term generally refers to the common or public schools, maintained at the expense of the public." (citation omitted)); 78 *C.J.S. Schools and School Districts* § 2 at 37 (1995) ("The word 'school' is a generic term of many definitions denoting an institution or place for instruction or education.... A 'school' is a place where instruction is imparted to the young; it is an institution of learning of a lower grade, below a college or university."); *but see* 84 *C.J.S. Taxation* § 283 at 566 ("[A]s used in the exemption laws, [school] has been defined as any institution of learning."). The Fund's training facility would be considered a school under the broad definition because it serves as an institution of learning. Under the narrower definition, the facility is not a primary or secondary school.

Arguably, the language of section 3.6 supports an inference that the Legislature intended to adopt a narrow interpretation of "school." Section 3.6 exempts "colleges, schools, academies or seminaries." A college, of course, is a post-secondary institution awarding bachelor or associate degrees and often doctorates as well. An academy is "an institution of learning.... In later use, a species of educational institution, of a grade between the common school and the college." *Black's Law Dictionary, supra,* at 26. A "seminary" is "[a] place of training, an institution of education, a school, academy, college or university in which young people are instructed in several branches of learning which may qualify them for their future employment." *Id.* at 1526. Therefore, the statute includes "schools," and all forms of post-secondary educational institutions. If "school" is read broadly to cover all institutions of learning, the other terms in the statute are superfluous; obviously, all colleges, academies, and seminaries are institutions of learning. If, on the other hand, "school" is read narrowly to include only primary and secondary schools, then the terms "college," "academy," and "seminary" are given their usual definitions. This Court has held that statutory "construction that will render any part of a statute inoperative, superfluous, or

meaningless, is to be avoided." *State v. Reynolds*, 124 *N.J.* 559, 564, 592 *A.*2d 194 (1991).

No published New Jersey case has ever defined the word "school" in the context of this statute. Although many cases have considered this exemption, they have all focused on the "for-profit" element without discussing the definition of "school." Each of those cases, however, has involved a primary or secondary school. *E.g., Kimberley Sch. v. Town of Montclair*, 2 *N.J.* 28, 30, 65 *A.*2d 500 (1949) (private day school for children); *Carteret Academy v. State Bd. of Taxes & Assessment*, 98 *N.J.L.* 868, 120 *A.* 736 (E. & A.1923) (private school for boys); *Dwight Sch. of Englewood v. State Bd. of Tax Appeals*, 114 *N.J.L.* 594, 596, 177 *A.* 875 (Sup.Ct.1935) (private school for girls), *aff'd*, 117 *N.J.L.* 113, 187 *A.* 36 (E. & A.1936); *Princeton Country Day Sch. v. State Bd. of Tax Appeals*, 113 *N.J.L.* 515, 518, 175 *A.* 136 (Sup.Ct.1934) (private school for boys aged ten to fifteen); *West Orange Tp. v. Joseph Kushner Hebrew Academy*, 13 *N.J. Tax* 48 (Tax Ct.1993) (private nursery school); *Buxton Country Day Sch. v. Township of Millburn*, 18 *N.J. Misc.* 443, 447, 14 *A.*2d 269 (Bd. of Tax Appeals 1940) (private elementary school). Indeed, the parties have not cited a case in New Jersey that applies the school exemption to any institution other than a primary or secondary school that teaches children in a traditional manner, is accredited, and awards diplomas. The Fund, of course, does not teach children, is not a traditional school, is not accredited, and awards no degrees, although it is monitored by the U.S. Department of Labor and awards certificates upon completion of the coursework.

The Fund cites *Township Committee of Denville v. Board of Education of Vocational School in the County of Morris*, 59 *N.J.* 143, 279 *A.*2d 842 (1971), as support for its position that its training facility should be tax-exempt. In *Denville*, the sole question was whether the zoning ordinance of Denville barred the county vocational school. The school provided "vocational training classes for high school students during the day with adults and veterans attending evening classes five nights a week." *Id.* at 145,

279 *A*.2d 842. The board of vocational education alleged that the motive behind the exclusion was a desire to avoid the loss of taxes from the parcel of land used for the school. *Id.* at 150, 279 *A*.2d 842. As *dictum*, the Court stated, "Educational institutions, such as public vocational schools, are tax free as a matter of paramount State policy...." *Ibid.* The Fund contends that that statement indicates that vocational schools, such as its own, are tax-free under *N.J.S.A.* 54:4–3.6. *Accord In re Bd. of Coop. Educ. Servs. of Nassau County v. Gaynor,* 33 *A.D.*2d 701, 306 *N.Y.S.*2d 216, 218 (1969) (stating public vocational school exempt from taxes), *appeal denied,* 26 *N.Y.*2d 612, 310 *N.Y.S.*2d 1025, 258 *N.E.*2d 729 (1970). However, the school in *Denville* was a public high school that provided training for high-school students and night-time education for adults. The Court's statement that the school was tax-exempt followed from its status as a public high school, its "broad educational purpose[,] and [its] relation to conventional elementary and high schools...." *Township Committee of Denville, supra,* 59 *N.J.* at 149, 279 *A*.2d 842.

Although there is no New Jersey case defining "school" in the context of section 3.6, a few cases have defined "college" for purposes of that section. In *Township of Princeton v. Institute for Advanced Study,* 59 *N.J.Super.* 46, 157 *A*.2d 136 (App.Div. 1960), the Institute for Advanced Study (Institute) sought a property-tax exemption as a "college." The Institute was a nonprofit corporation that conducted seminars for and provided research access for postdoctoral students. *Id.* at 49–51, 157 *A*.2d 136. Because all the members had doctorates, the Institute awarded no degrees. *Id.* at 51, 157 *A*.2d 136. Princeton claimed that this was not a college in the traditional sense. *Id.* at 52, 157 *A*.2d 136. The court rejected that claim:

> We are not persuaded that "college," as used in the statute, is to be confined to the kind of institution that has become so familiar to us, where there are teachers and pupils, courses of instruction, a conferring of degrees, and an extended discipline. The concept of a college is an organic one, taking on a varying aspect in different times and places.
>
> [*Ibid.*]

The court explained that "college" had different meanings in different historical periods, and that this institution of scholars and research fit into the broad definition of an institution of learning. *Id.* at 52–55, 157 *A.*2d 136.

The Fund argues that "school" should be given a similarly broad interpretation to reflect many different types of schools. We note that the holding in *Institute for Advanced Study* simply implies that the term "college" should not be interpreted solely to cover traditional colleges; it does not suggest that every barber's college or art school is also a college, but rather that some nontraditional colleges will meet the definition of "college."

In *Textile Research Institute v. Township of Princeton,* 35 *N.J.* 218, 172 *A.*2d 417 (1961), we added the requirement to section 3.6 that a "college" not be primarily for the benefit of a specific for-profit sector of the economy. The Textile Research Institute (Textile Institute) was a nonprofit organization in Princeton composed of company and personal members seeking a property-tax exemption. *Id.* at 219, 172 *A.*2d 417. All company members were involved in the textile business. *Ibid.* Company members elected thirty trustees to govern the Textile Institute. *Id.* at 219–20, 172 *A.*2d 417.

The Textile Institute had three major purposes: "[t]o provide instruction, to conduct research and to disseminate knowledge in the arts, sciences, technologies, and economics, particularly those relating to the field of textiles." *Id.* at 220, 172 *A.*2d 417. The Institute provided instruction by offering labs to predoctoral students at Princeton University and postdoctoral fellows. *Ibid.* Predoctoral students took courses at Princeton, but their doctoral theses were jointly supervised by Princeton faculty members and Textile Institute staff scientists. *Ibid.* Over half accepted jobs with company members upon graduation. *Ibid.*

The Textile Institute's research objective involved projects that were selected by member companies, and the results could be withheld from others for two years at member requests. *Id.* at 222, 172 *A.*2d 417. Finally, the Institute published two journals to

disseminate information; one of these journals was limited to members and provided advance information on new developments. *Ibid.*

The Institute sought an exemption, and the Court considered one issue: "whether the Textile Research Institute is a 'college' within the meaning of [*N.J.S.A.* 54:4–3.6]?" *Id.* at 219, 172 *A.*2d 417. The Court was not considering the "for-profit" prong of the test, but merely the statutory definition of "college." While conceding that "college" was given a broad definition in *Institute for Advanced Study, supra,* 59 *N.J.Super.* 46, 157 *A.*2d 136, the Court refused to view this particular institute as a college. *Id.* at 223, 172 *A.*2d 417. The Court stated:

> But the word "college" does not embrace an organization which is controlled by a particular profit-making segment of society and which is devoted principally and primarily to research for the benefit of that industry. The power of member companies to elect the board of trustees and to vote at business meetings, and company participation in various advisory committees, result in control of policy and programming of the Textile Research Institute. The company members' privilege to consult with the Institute staff, their participation in group-supported special projects, the sponsorship of special projects by individual companies and their receipt of advanced and special information therefrom, their sponsorship of participating fellowships, their participation in Institute seminars and meetings, and the advantages of the *Notes on Research* lead to the inescapable conclusion that the Institute *is primarily designed to benefit the textile industry.*
>
> All these factors compel the view that the Textile Research Institute is not an institution of learning as traditionally understood, and therefore is not a "college" within the meaning of *N.J.S.A.* 54:4–3.6.
>
> [<em>Ibid.</em> (emphasis added).]

We had an opportunity to address the rationale of *Textile Research* in *Town of Bloomfield v. Academy of Medicine of New Jersey,* 47 *N.J.* 358, 221 *A.*2d 15 (1966). The two cases differ because in *Academy of Medicine,* the Academy sought its tax exemption for being "organized exclusively for the moral and mental improvement of men, women and children," and not for being a school. *Id.* at 360, 221 *A.*2d 15. The Academy was composed of doctors and dentists, but it allowed the public to use its library and to attend symposiums. *Id.* at 362–63, 221 *A.*2d 15. We granted the exemption and declined to follow our rationale in *Textile Research* because the Academy was a "nonprofit, altruistic,

beneficent organization contributing to the general health and welfare of the community. It d[id] not compete with private enterprise *nor d[id] it primarily aid one segment of private enterprise.*" *Id.* at 365, 221 *A.*2d 15 (emphasis added).

The Fund distinguishes *Textile Research,* arguing that the Textile Institute was excluded because it was not only controlled by a particular profit-making industry, but because it was devoted "principally and primarily to research for the benefit of that industry," whereas the Fund's focus is not on researching improved construction techniques but on the education of the students. The Appellate Division agreed. *New Jersey Carpenters Apprentice Training and Educ. Fund, supra,* 284 *N.J.Super.* at 528, 665 *A.*2d 1128. We disagree.

The Fund is more akin to the Textile Institute than to the Academy of Medicine. The fund is controlled by and operated primarily for the benefit of the construction industry. Students from outside the industry are educated in carpentry, and their education is intended to encourage them to join that industry, as was the case in *Textile Research.*

### III

In *Kimberley School, supra,* 2 *N.J.* at 37–38, 65 *A.*2d 500, we listed certain factors that are relevant in determining whether a school is conducted for profit. An examination of the second factor, the character and nature of the board membership, offers further support for the conclusion that the training center is operated predominantly by and for the benefit of the construction industry. *See Textile Research Institute, supra,* 35 *N.J.* at 223, 172 *A.*2d 417 ("Ownership is extremely relevant in determining the nature and function of the organization under scrutiny and is examined merely to reveal the use to which the property is being put.") (citations omitted).

Here, the Tax Court found that the Board was composed of "advocates in a segment of society that is profit-driven." Under the Trust, half of the trustees are appointed by the unions and half

by the employers; each can be discharged at the will of the group that appointed that trustee. The Fund contends that the board's composition was not designed to benefit a for-profit group, but to balance the interests of two groups. Furthermore, the Fund notes that each trustee has an independent fiduciary duty to promote the educational purposes of the school. *See Wolosoff v. CSI Liquidating Trust,* 205 *N.J.Super.* 349, 359–60, 500 A.2d 1076 (App.Div.1985) (holding that trustee's fiduciary duty exists independent of any clause in trust agreement).

However, the trustees are appointed by the construction industry—the employees and the Union. Although the Fund correctly asserts that it does not automatically follow that the trustees are advocates for either interest, the trustees serve at the will of these interests. The trustees are all controlled by the industry and their primary role is to benefit that industry by providing more skilled workers for the employers and more union members for the Union. Those facts support the finding that the training center is operated primarily for the benefit of the unions and companies in the construction industry rather than for the public.

Additional support for that conclusion is that the revenues are not related to the cost of providing an education for the apprentices. *See Kimberley Sch., supra,* 2 *N.J.* at 38, 65 A.2d 500. The revenues generated are based on a percentage of Union employees' wages. That source of revenue has resulted in the Fund having assets of $9,684,000, $5,000,000 of which is in cash and marketable securities. The Fund asserts that those assets do not alter its status because they cannot be distributed to the Union or the employers.

The Trust provides that if the Fund terminates, "no part of the corpus or income of this Fund shall be used for or diverted to purposes other than Apprentice Training and Educational purposes." To distribute the Fund's assets for the educational use of any other industry would therefore be inconsistent with the Fund's stated purpose and would be unfair to those Union members who helped create the surplus. Thus, that factor also

indicates that the Fund primarily benefits the construction industry; i.e., the employers, the Union, and the employees.

## IV

Many states have denied real-estate exemptions to schools that do not provide traditional types of education and that primarily benefit a particular occupation, profession, or group rather than the public. *See, e.g., Alcoser v. County of San Diego,* 111 *Cal.App.*3d 907, 169 *Cal.Rptr.* 91, 92–93 (1980) (denying exemption to construction trade school because "Trust was primarily intended to and did benefit its union and employer parties and not the community in general[,]" despite evidence that community received indirect benefit); *California College of Mortuary Science v. County of Los Angeles,* 23 *Cal.App.*3d 702, 100 *Cal.Rptr.* 558, 560 (1972) (denying exemption to vocational school in mortuary sciences because it did "not benefit primarily the community as a whole ..., but benefits instead primarily a definite segment thereof, namely, the funeral service industry by providing for it competently trained personnel"); *Milward v. Paschen,* 16 *Ill.*2d 302, 157 *N.E.*2d 1, 6 (1959) (denying tax exemption to foundation that "serve[d] mortuary profession[ ] and [was] designated to bring greater commercial success to that profession"); *Winona Sch. v. Department of Revenue,* 211 *Ill.App.*3d 565, 156 *Ill.Dec.* 47, 570 *N.E.*2d 523, 527 (1991) (denying real-estate tax exemption to operator of private photography school because operator "did not provide[ ] comprehensive course of study"), *cert. denied,* 141 *Ill.*2d 562, 162 *Ill.Dec.* 511, 580 *N.E.*2d 137 (1991); *American Ass'n of Cereal Chemists v. County of Dakota,* 454 *N.W.*2d 912, 915–16 (Minn.1990) (holding American Association of Cereal Chemists and American Phytopathological Society was not entitled to real-estate tax exemption as "seminaries of learning" even though their primary purpose was educational because the "offerings [were] restricted to the limited area the organizations promote"); *Nebraska State Bar Found. v. Lancaster County Bd. of Equalization,* 237 *Neb.* 1, 465 *N.W.*2d 111, 121 (1991) (denying tax exemp-

tion to Bar Foundation because it had not shown that it "[was] an institution with the primary or predominant activity of offering regular courses with systematic instruction in academic, vocational, or technical subjects"); *PICPA Found. for Educ. & Research v. Commonwealth,* 143 *Pa.Cmwlth.* 291, 598 *A.*2d 1078, 1082, 1083 (1991) (holding that petitioner was not entitled to refund as nonprofit educational institution because it operated "primarily and predominantly to benefit individuals who have a professional or occupational interest in accounting subjects" and only conferred "an indirect benefit to the public in general"), *aff'd,* 535 *Pa.* 67, 634 *A.*2d 187 (1993); *Ski–Lan Gymnastics & Performing Arts Educ. Found., Inc. v. City of Rutland,* 143 *Vt.* 294, 465 *A.*2d 1363, 1365 (1983) (denying exemption to nonprofit school for gymnastics and performing arts because it provided "an essentially private benefit to a limited class of persons"); *Engineers and Scientists of Milwaukee, Inc. v. City of Milwaukee,* 38 *Wis.*2d 550, 157 *N.W.*2d 572, 578 (1968) (holding property for continuing education and professional advancement of engineers and scientists was not within legislature's intent when it exempted property for educational associations).

Other states have adopted an intermediate approach, exempting nontraditional schools on a case-by-case basis. Those jurisdictions recognize that "[t]he more remote the objects and methods become from the traditionally recognized objects and methods the more care must be taken to preserve sound principles and to avoid unwarranted exemptions from the burdens of government." *Cummington Sch. of the Arts, Inc. v. Board of Assessors of Cummington,* 373 *Mass.* 597, 369 *N.E.*2d 457, 462 (1977) (quoting *Boston Chamber of Commerce v. Assessors of Boston,* 315 *Mass.* 712, 54 *N.E.*2d 199, 202 (1944)). Similarly, the New Hampshire Supreme Court stated:

> After careful considerations and a review of standards used by other jurisdictions, however, we are convinced that the construction of a bright-line test is impossible; each case will necessarily depend on its own peculiar facts.... Fourth, although it is not necessary that the training be of the type that would otherwise be furnished by the government, the task of the taxpayer to prove that he falls within the exemption will be more difficult as the divergence from traditional educational methods and objectives increases.

[*New Canaan Academy, Inc. v. Town of Canaan*, 122 *N.H.* 134, 441 *A.*2d 1174, 1176 (1982) (citations omitted).]

The case-by-case approach has the advantage of preventing a flood of new exemptions for art schools and the like although preserving some flexibility in the statutes to recognize new types of educational institutions. On the other hand, it does not provide a standard for courts to follow and ensures that every nontraditional school will litigate its exemption status.

Other states have adopted an even less restrictive definition of schools. In most of those jurisdictions, however, the inquiry focuses on whether the institution serves "an educational purpose." *See, e.g., McKee v. Evans*, 490 *P.*2d 1226, 1230–31 (Alaska 1971) (granting exemption to Apprentice and Manpower Training Trust's nonprofit educational school because "educational purposes" were defined to "include[ ] systematic instruction in any and all branches of learning from which a substantial public benefit is derived"); *see also J.A.T.T. Title Holding Corp. v. Roberts*, 258 *Ga.* 519, 371 *S.E.*2d 861, 862 (1988) (holding trade school operated by union trust was "seminary of learning"); *Smith v. Feather*, 149 *Tex.* 402, 234 *S.W.*2d 418, 421 (1950) (granting exemption to school offering design and interior decorating courses because school had three-year course of study, awarded diplomas upon completion, and was approved by Veterans Administration and State of Texas).

The Internal Revenue Service also has adopted a broad definition of "educational" institutions in *I.R.C.* § 501(c)(3), which provides an exemption to "corporations, and any community chest, fund, or foundation, organized and operated exclusively for ... educational purposes." It includes " 'schools' as one might colloquially think of them: institutions with a regularly scheduled curriculum ... including primary and secondary school[s], colleges, professional schools, and trade schools." John D. Colombo, 35 *Ariz. L.Rev.* 841, 847 (1993). However, it also extends the exemption to any organization providing instruction to the public "on subjects useful to the individual and beneficial to the commu-

nity," including jazz festivals and university bookstores. *Ibid.* (citations omitted). Of course, a property owner's exemption from federal income taxation does not determine whether the owner's property is tax-exempt under state real-estate law. *New Canaan Academy, Inc., supra,* 441 A.2d at 1176.

V

The exemption laws are strictly construed against the taxpayer, and the taxpayer bears the burden of proving the exemption. All debatable issues are resolved in favor of the taxing municipality. Although a close case, the Fund has not convinced the Court that the statutory exemption for "school" was intended to cover its training facility. The plain meaning of the statute and prior case law supports that conclusion.

To adopt the broad definition for "school" would be tantamount to reading colleges, academies, and seminaries out of the statute. We are reluctant to interpret "school" in a way that makes those other words superfluous. Moreover, although the Fund serves an educational purpose in training the apprentices to become skilled carpenters, the Fund is not a traditional school and does not benefit our society in the way the Legislature contemplated when it enacted section 3.6. "Undeniably[,] it is the public benefit resulting from education that justifies granting schools and colleges exemption from taxation, but such benefit cannot be exactly admeasured either on the part of the schools or of the public." *Kimberley Sch., supra,* 2 *N.J.* at 42, 65 A.2d 500. Here, the Fund's primary purpose is to benefit the construction industry, i.e., its employers and its employees.

Thus, we conclude that the training facility is not a school. *Textile Research, supra,* 35 *N.J.* 218, 172 A.2d 417, precludes an exemption in this case because the Fund was operated primarily to benefit a particular profit-making sector of the economy in the same sense as the Textile Institute in that case. If this Fund is granted an exemption, then other "institutions of learning" that predominantly benefit one profit-making segment will claim ex-

emptions. That will have an adverse impact on municipal tax bases. The statute is to be strictly construed against the taxpayer. Absent a more compelling legislative message of intent, we cannot condone the grant of tax-exempt status.

The judgment of the Appellate Division is reversed.

*For reversal*—Chief Justice PORITZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.