NOT FOR PUBLICATION WITHOUT APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS

## TAX COURT OF NEW JERSEY



**Mala Sundar**
 **JUDGE**

R.J. Hughes Justice Complex
 P.O. Box 975
 25 Market Street
 Trenton, New Jersey 08625
 Telephone (609) 943-4761
 TeleFax:   (609) 984-0805
 taxcourttrenton2@judiciary.state.nj.us

August 14, 2019

Karl H. Buch, Esq.
DLA Piper L.L.P.
Attorney for Plaintiff

Lani Lombardi, Esq.
Cleary Giacobe Alfieri Jacobs, L.L.C.
Attorney for Defendant

Re:    River Rats Inc. v. Borough of Fair Haven
Block 27, Lot 21; Block 27, Lot 71
<u>Docket No. 008332-2016</u>

Dear Counsel:

This opinion denies summary judgment to plaintiff which requested an Order granting local property tax exemption to the above captioned properties, and grants defendant's cross-motion for the same relief. For the reasons more fully explained below, the court concludes that plaintiff does not meet the statutory requirements for exemption of buildings used either as a "school" or for the moral and mental improvement of the public; the storage sheds on Lot 21, which are the only structures therein, are not "buildings" as that term has been construed; and Lot 71 does not merit an exemption either as contiguous to Lot 21 or on its own (being vacant land).

## **FACTS**

The facts are taken from the parties' pleadings, which are supported by documents and/or certifications, and are undisputed by either party as to any material aspect.

*

*The Property*[1]

Plaintiff ("RRI") owns the above-referenced parcels. Lot 21 is classified as a Class 2 property (residential, see N.J.A.C. 18:12-2.2(b)), with a street address of "Battin Road." It measures about 1.51 acres, has an additional lot 24.1, and is located in zone R-30 (single family residential per §30-5.2 of the Zoning Code of the defendant ("Borough")).[2]

Lot 71 is classified Class 1 (vacant land, see N.J.A.C. 18:12-2.2(a)), with an address of "Battin Rd Rear." It is an irregularly shaped lot measuring 175x205 square feet ("SF") or about 0.8 acres, and located in zone R10A (single family residential per the Borough's Zoning Code §30-5.2).[3] RRI maintains that Lots 21 and 71 are contiguous (based on a sale deed which include five tracts of land). The Borough does not dispute their contiguity.

Lot 21 has five storage structures that are used to store RRI's sailing equipment (boats, sails, masts, booms, rudders), which is used for its activities, and other equipment needed to maintain the property. One storage structure is used to store picnic items, a barbecue grill, and items used in RRI's events. All these structures are wood-framed, and stand on concrete or cinder blocks, or other wooden support systems. The photographs show them to be colored green, and similar to any general storage sheds (such as ones used in residential backyards but of larger or different shapes). Thus, they have enclosed walls with hinged doors (which are padlocked), and have sloping "roofs," some of which appear to be tiled. There are no windows. One shed has a logo with a picture of a rat and the name Fair Haven Sailing Club. Sailing or other paraphernalia

---

[1] "Property" as used herein include Lots 21 and 71.
[2] Per the website of the Monmouth County Board of Taxation ("County Board"), www.njactb.org.
[3] Per www.njactb.org.

2

are stacked beside or behind these sheds, and on the ground. The photographs also show wooden picnic tables with attached benches, a trailer with the logo Fair Haven Sailing Club, a large platform made of wood planks resting on cinder blocks, and boats (stacked or singular) on various portions of the land. There is also a large bulkhead and a dock on the Lot.

Per RRI, Lot 71 is below the mean high tide water level, thus, owned by the State, and therefore, allegedly, cannot be developed or improved. It is occasionally used for kayaking and canoeing by RRI's members (aka "Club members") and the general public.

RRI's balance sheet (in Form 990, its federal tax returns), reported "Land and Buildings" as an asset. On the depreciation schedules attached in this connection, RRI elucidated this asset as "Grounds–Structures–Flagpole," which were "placed in service" in 2009, at a cost of $1,050. Almost all of the other assets on the schedule were sailing equipment and facilities (such as boats, engines, and trailers). Also listed was the bulkhead and dock. For tax years ("TY") 2013-2015, the end-of-year value of Land & Buildings was $29,332; $24,681; and $26,031 respectively.

*Procedural Background*

In May 2015, RRI filed an Initial Statement with the assessor for the Borough seeking local property tax exemption under N.J.S.A. 54:4-3.6. RRI stated its organizational purpose was "sailing instruction and safe boating for children and families." It listed only Lot 21 (which RRI claims was an inadvertent scrivener's error), and described it as improved with five wood-frame storage buildings measuring from 18 SF to 64 SF, a bulkhead and a dock, these improvements being used entirely for storage of sailing and boating equipment.

3

In September 2015, RRI's counsel, in response to the assessor's request, provided documentation and clarified that it was seeking a tax exemption since the buildings were used for educational purposes and for the moral and mental improvement ("MMI") of the general public, either of which purpose satisfied the requirements of N.J.S.A. 54:4-3.6. Counsel also provided additional details of the types of membership and programs offered by RRI, the nature and amount of fees, and how the property was being used.[4]

In November 2015, the Borough's assessor sent notices of assessment for TY 2016 assessing Lot 21 at $313,500, and Lot 71 at $82,300. RRI timely petitioned the County Board on January 9, 2016, challenging these assessments on grounds the parcels should be tax exempt.

By letter of January 16, 2016, the Borough notified RRI that its exemption application was denied because the assessor's inspection had revealed that the "buildings" on Lot 21 were small wooden storage sheds and a platform atop cinder blocks. These, per the Borough, were not permanent structures, a normally understood meaning associated with the term "building." The Borough's letter referenced only Lot 21 (presumably since RRI's Initial Statement had referenced only this parcel).

By judgments dated March 31, 2016 (and mailed April 11, 2016), the County Board denied the exemption claims and affirmed the assessments. RRI timely appealed the same to this court, claiming the parcels should be tax exempt either as being used for purposes of education (thus, as a school), or for the MMI of the public. This summary judgment motion followed.

---

[4] Counsel also clarified that a prior application for tax exemption made in 2010 was denied due to lack of any buildings on Lot 21.

The Borough opposed and cross-moved for summary judgment in its favor on grounds (1) the storage sheds were not buildings for purposes of the exemption statute; (2) Lot 71 was vacant land, thus, not entitled to exemption; (3) RRI never filed an initial statement seeking exemption as to Lot 71, thus cannot use this litigation to obtain an exemption; and (4) RRI's use of the Property does not fall within the requirements of a school, or the MMI exemption provisions.

*RRI's Organizational Background*

RRI was incorporated in 1960 under Title 15 of the New Jersey statutes (governing not-for-profit entities), trading as Fair Haven Sailing Club. It is also recognized as a federally income tax-exempt organization under I.R.C. § 501(c)(3).

RRI's Articles of Incorporation sets forth its purposes as promoting interest, encouraging and sponsoring children and family group participation in "aquatic activities among children," providing training and instruction in the same; and to own, manage and provide the necessary "facilities" to enable participation and further RRI's purposes. RRI's Constitution (preamble to the by-laws) reiterates these purposes.

The by-laws delineate four classes of memberships: family, honorary, sustaining, and life. Family memberships are for families with at least one child under age sixteen. Life memberships are for founding families or families who have provided long term service to RRI. Family and life members have voting rights in RRI decisions, but only family members pay initiation fees and dues. Family membership is limited to 125 families, up to 25 of which can be non-residents, and with preference to residents of the Borough.

5

Honorary members are public officials or "friends" of RRI who "deserve the honor of" being recognized as a member. Both honorary and sustaining members have no "facilities privileges" or voting rights, and can participate in the Club's social activities, yet only sustaining members pay dues.

Under the by-laws, RRI is to be operated by Trustees (six family members) and officers (family members in good standing), a majority of these being Borough residents per a list attached to RRI's Form 990). There are no directors. Activities are run by committees. Policy decisions are made by trustees.

The by-laws also provide that upon RRI's dissolution, all its liabilities should be first paid, then, all its assets should be disposed of either "exclusively for purposes of" RRI, or to any I.R.C. § 501(c)(3) entity which is "organized and operated exclusively for charitable, scientific, religious or educational purposes," or to the Borough. Any assets not so disposed of must be "disposed of by a court of competent jurisdiction."[5]

*RRI's Activities and Use of the Property*

In 1966, RRI applied for zoning variances, which the Borough denied for the construction of a building, but permitted for use of the "premises for a" non-profit "community service organization" and "attendant use . . . for parking." The variance grant was conditioned upon use of the "premises" for "family sailing and recreational activities" including instruction/education in sailing, and competitive racing, but using RRI's equipment; limiting membership to 125 families, of which 25 could be non-residents; limiting the number of motorboats to be used; allowing

---

[5] RRI amended its Certificate of Incorporation in 1979 to include these dissolution provisions.

maintenance of a dock, above-tide structure, and storing racks; controlling noise level and hours of operation.[6]

RRI offers two summer sailing programs, one for juniors and one for adults. The junior program has two separate summer sessions in a year (June to mid-summer, then mid-summer to August) for 2½ days weekly. Classes are scheduled in advance, enrollment is documented in a class roster, and textbooks are provided. Children are taught theoretical and practical lessons in sailing techniques, water safety, equipment use and management, and other related matters. Theory classes are held on picnic benches under a canopy or a gazebo, while practical lessons are on water. Instructors are certified (educationally by taking courses in sailing/boating, and safety-wise by taking courses in first-aid and CPR), and are high school students or college age individuals who are paid salaries for their services. No officer or trustee of RRI in a committee in charge of the junior program is paid any compensation.

The junior program is the primary revenue source for RRI and makes the majority use of the Property (real and personal). Equipment is supplied by RRI (except for lifejackets). The fees for the junior program is $375 with a membership, and $600 without (which increased to $395 and $630 respectively in 2017). The "Revenue Detail" spread sheet showed that for 2015 there were 102 students (52 members and 50 non-members). For 2016 and 2017 this was also the "projected count," while for 2018 the projected count was 102 (64 members and 38 non-members).

---

[6] The resolution did not specify the "premises" by Block/Lot number or street address, rather simply referred to the premises as "Battin Road Property." RRI claims "premises" includes both Lots 21 and 71, while the Borough claims it means only Lot 21. The difference is irrelevant since the court must decide the use of both lots as of the assessment date for the TY at issue here to decide whether both are tax exempt.

7

A student receives an allegedly State-recognized certification in sailing upon completion of the training course from RRI. Per RRI, scholarships can be awarded to students with financial need. Note however, that in response to the question on Line 4b of Schedule E of Form 990 (to be filled out by a "school" as defined by I.R.C. §170(b)(1)(A)(ii)[7]), RRI stated that "we don't provide scholarships or financial assistance." Line 4b asks whether the tax-exempt organization maintains "records documenting that scholarships and other financial assistance are awarded on a racially nondiscriminatory basis."

The adult sailing program is smaller in student body and course length (3 class room sessions and 3 water sessions during summer) than the junior program. The cost for an adult student was $100 in 2014-2016, and increased to $175 in 2017. Instructors are RRI member-volunteers who are not paid. Loaner or volunteer boats are used. As with the junior sailing program, no officer or trustee of RRI receives any compensation. The "Revenue Detail" spreadsheet showed that for TY 2014 there were 10 adult students, and for TY 2015 there were 7. The projected count for TY 2016 was 7, then was 5 for TYs 2017 and 2018.[8]

RRI also runs a Loaner Boat Program to entice new membership for individuals who do not own boats, and who can use RRI's boats for a fee of $175. Members can also participate for a fee. The fees are used to offset equipment/facilities maintenance expenses.

---

[7] I.R.C. §170(b)(1)(A)(ii) limits the deductible portion of charitable contributions made to various entities including "an educational organization which normally maintains a regular faculty and curriculum and normally has a regularly enrolled body of pupils or students in attendance at the place where its educational activities are regularly carried on."

[8] It is unclear whether the adult "students" are solely members of RRI or include non-members. Unlike the junior program, there is no differing fee rate structure for members and non-members.

RRI organizes weekly races during summer. Public can access Lot 21 to spectate for free. On occasion, public can also register and participate in these races. According to RRI's brief, the races are important because most of the Borough's shoreline is covered by private residences, therefore, the Borough's "community has very limited access to the river."

RRI members volunteer services in connection with the junior sailing program such as repairing boats, organizing the program and weekly races, and generally maintaining equipment and other personal property. The membership fees and revenue from the adult training program offset a portion of the costs of the junior sailing program.

*RRI's Financial Information*

For TYs 2014 and 2015, RRI charged an annual fee of $350 for family membership, which increased to $370 for TYs 2016 and 2017. A sustaining membership fee is $50, which entitles such member to participate in RRI's social activities. Other fees include mooring ($375) and storage of dinghies, canoes or kayaks ($75). Members are permitted use of RRI's dock and mooring field as well as picnic tables. RRI hosts social activities (parties, open houses and member meetings) and sailing events for its members who are charged separate fees to offset the connected costs. The sailing programs also are for a fee as noted above, with members receiving a discount for the same as opposed to non-members.

RRI's income sources are member dues, member fees, training tuition, miscellaneous, and donations. Each of these categories comprise the following items:

| | |
|---|---|
| Member Dues | Family; Sustaining |
| Member Fees | Loaner Boat; Mooring; Kayak/Sunfish/Canoe; Small Boat Dolly; Miscellaneous |
| Training Tuition | Adult Training; Junior Training |

| | |
|---|---|
| Miscellaneous | Imprint & Skipper's Shop; Interest; Sales of Boats & Trailers; Racing & Social; Fair Haven Town |
| Donations | Donations; Security Deposits (dues); Fundraising |

RRI's revenue for TYs 2014 to 2017 was follows:

| TY | TOTAL REVENUE (rounded) |
|---|---|
| 2014 | $74,547 |
| | (Tuition $46,795; Dues/Fees $24,365; Donations $1,400; Fundraising $0) |
| 2015 | $95,880 |
| | (Tuition $50,083; Dues/Fees $38,830; Donations $5,200; Fundraising $0) |
| 2016 | $83,283 |
| | (Tuition $40,812; Dues/Fees $35,343; Security Deposit $1,200; Donations $4,710; Fundraising $0) |
| 2017 | $78,025 |
| | (Tuition $28,259; Dues/Fees $25,373; Security Deposit $2,250; Donations $9,843.50; Fundraising $0). |

The "Revenue Detail" spreadsheet showed the membership fees (family and sustaining) received for 2015 were $25,400 ($24,850; $450); $22,500 for 2016 ($22,050; $450); and $22,700 for 2017 ($22,200; $500). That spreadsheet also showed the 2015 total revenue from the junior training program was $49,500 ($19,500 from the 52 members; $30,000 from the 50 non-members), and $700 from the adult program ($100 from the 7 students). For the other years there was no detail as to what was the actual amount received as fees from either the junior or adult program, or what portion of the revenue was from members and non-members.[9]

Expenses were itemized into five categories: administration, facilities, fleet, training, and racing/social. Each of the five categories comprised of the following items:

| | |
|---|---|
| Administration | Association Dues; Bank Fees; Gifts; Imprint Purchases; Insurance; Miscellaneous; Advertising; Website; Postage; PO Box Rental |

[9] On Schedule E of Form 990, RRI noted that "we don't solicit contributions" in response to the question on Line 4d asking for all materials used to solicit contributions.

| | |
|---|---|
| Facilities | Real Estate Tax; Moorings State Fee; Maintenance (moorings; buildings/equipment; grounds; dock); Utilities; Sewer; Storage Locker; Hardware; Kayak Racks; Other Facilities |
| Fleet | Registration (boats; trailers); Fleet Maintenance (power and sail, trailers, loaner boats, dinghy); Boat Purchases; Fuel; |
| Training | Instructor Salaries; Certification/Education; Training Materials; Other |
| Racing & Social | General Expenses |

The breakdown for TYs 2014 to 2017 showed that the major expense was for training. Thus:

| TY | TOTAL EXPENSES (rounded) |
|---|---|
| 2014 | $87,455 (Training $39,022; Facilities $19,894; Administration $15,918; Fleet $10,218; Racing & Social $2,403; Boat Purchase). |
| 2015 | $86,237 (Training $42,822; Facilities $13,655; Administration $16,874; Fleet $13,657; Racing & Social $3,229). |
| 2016 | $84,430 (Training $38,410; Facilities $20,309; Administration $16,716; Fleet $8,177; Racing & Social $818) |
| 2017 | $73,379 (Training $29,787; Facilities $13,579; Administration $17,168; Fleet $13,273; Racing & Social -$427). |

## ANALYSIS

*A. Appropriateness of Summary Judgment*

Summary judgment will be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). Here, the sole issue is whether the Property is tax exempt, and the material facts for purposes of resolution of this issue are undisputed. Therefore, summary judgment as a method of disposition is appropriate.

*B. Tax Exemption*

Tax exemptions are only allowed by "general laws," and can be modified or repealed "except those exempting real . . . property used exclusively for religious, educational, charitable or cemetery purposes, as defined by law, and owned by any corporation or association organized and conducted exclusively for one or more of such purposes and not operating for profit." N.J. Const., art. VIII, § 1, ¶ 2.

The enabling statute is N.J.S.A. 54:4-3.6, which details the exemption and conditions for obtaining the same. It exempts "buildings," and the land required to support those buildings, but not exceeding 5 acres and provided it is "devoted" solely to the tax-exempt purposes. Id. (clause 12).[10] Other requirements for the exemption are in the "proviso" clauses, which are that (1) "the buildings, or the lands on which they stand, or the . . . corporations . . . using and occupying them," should not be "conducted for profit;" (2) the corporate claimant must "own[] the property in question"; (3) the corporate claimant is "incorporated or organized under" New Jersey laws; and, (4) the corporate claimant is "authorized to carry out the purposes on account of which the exemption is claimed." N.J.S.A. 54:4-3.6.[11] These provisos have been summarized by our Supreme Court as follows:

> To secure an exemption for its real property, a corporation must
> meet the following three criteria:
> (1) it must be organized exclusively for the [statutorily allowed tax
> exempt purpose];

---

[10] Because the statute provides an exemption for several types of property owners and property uses in essentially one sentence as separated by semi colons, the court refers to the language within a semicolon as a "clause."

[11] The additional conditions apply to all types of property owners and property uses specified in N.J.S.A. 54:4-3.6.

12

(2) its property must be actually and exclusively used for the tax-exempt purpose; and
(3) its operation and use of its property must not be conducted for profit.

[Paper Mill Playhouse v. Twp. of Millburn, 95 N.J. 503, 506 (1984)].[12]

There is also a procedural requirement. N.J.S.A. 54:4-4.4 requires an assessor to obtain "an initial statement under oath" from an owner of real property "for which a tax exemption is claimed," and the "right to the same." This initial statement should be received by the assessor by November 1 of the pre-tax year. Ibid. Thereafter, every three years an assessor can require a "further statement" as to the right for an exemption, but can at any time require further statements (with any proof in support) for justification of the continuation of the exemption. Ibid. The assessor is required to file a duplicate copy of any such statement with the county board of taxation by January 10 of the following tax year. Ibid.

1. Failure to File Initial Statement for Lot 71

The court rejects the Borough's argument that this court lacks subject matter jurisdiction to decide whether Lot 71 should be granted exemption because RRI's initial statement for an exemption listed only Lot 21. This procedural requirement, albeit imposed by a statute, does not prevent this court's review of the merits. See Blair Academy v. Twp. of Blairstown, 95 N.J. Super. 583, 591 (App. Div. 1967) ("The failure of the municipal assessor to obtain the statements, which N.J.S.A. 54:4-4.4 makes it mandatory for him to obtain, should not deprive this nonprofit academy of the tax exemption to which it is entitled by law."). Cf. Atlantic Cty. New School, Inc. v. City

---

[12] In Paper Mill, the Court was dealing with the MMI exemption. 95 N.J. at 506.

13

of Pleasantville, 2 N.J. Tax 192, 196-197 (Tax 1981) (while "the failure to file" an initial statement "may not vitiate the exemption . . . [since] it is not a condition precedent to the allowance of an exemption," nonetheless, "if there is no qualification for exemption under N.J.S.A. 54:4-3.6 in the first place by ownership and use on October 1, the property is not entitled to exempt status for the tax year in question") (citation omitted)).[13]

Additionally, here, the court's subject matter jurisdiction is clear: (1) RRI filed petitions before the County Board seeking an exemption as to both Lots 21 and 71; (2) the County Board issued two judgments, one for each Lot 21 and 71 denying the exemption sought; and (3) RRI timely challenged both these judgments to this court. Evidently, the Borough is not prejudiced because it cross-moved for summary judgment on grounds Lot 71 is vacant land thus, the Borough obviously knows the physical characteristics of this parcel. Additionally, where the Borough is relying on the fact that RRI's 2010 exemption application was denied because there were no buildings, then it cannot ignore the fact that the 2010 initial statement clearly included both Lots 21 and 71. Therefore, the court rejects the contention that it cannot review claims as to Lot 71.

2. Exemption under N.J.S.A. 54:4-3.6

It is undisputed that RRI, the claimant, is owner of the Property, and was incorporated and organized as a nonprofit entity under Title 15 of the New Jersey laws (the predecessor to Title 15A, "New Jersey Nonprofit Corporation Act."). There is also no dispute that, and as evidenced by RRI's organizational documents, RRI is authorized to carry out the purposes for which it was

---

[13] Cf. N.J.S.A. 54:4-3.6c (a taxing district's governing body can, for good cause, return taxes paid for a property that "would have been exempt" under N.J.S.A. 54:4-3.6 "had timely claim been made.").

incorporated, which is to operate as Fair Haven Sailing Club, teach/train the art/science of sailing, and the concomitant activities which accompany sailing (water safety), and to own/maintain the facilities necessary to accomplish these purposes.

This leaves the issues whether RRI is organized exclusively for a tax exempt purpose, whether the Property is actually being used for the same, and whether an exemption is warranted if the storage sheds are not "buildings" for purposes of N.J.S.A. 54:4-3.6.

(i) Exemption as a School

N.J.S.A. 54:4-3.6 (clause 1) exempts "all buildings actually used for colleges, schools, academies or seminaries." However, if "any" part of the buildings are "leased" to for-profit entities, or are used for non-exempt or for-profit purposes, then such portion will not be granted an exemption. Ibid.

"[S]tatutes granting exemptions from taxation are to be strictly construed against those seeking exemption," Paper Mill, 95 N.J. at 506-507, since each property must bear its fair share of the tax burden. Of course, this does not justify a strained or distorted interpretation of the exemption statute or its "legislative intent." Id. at 507. Nonetheless, the burden of proof and persuasion that an exemption is warranted lies squarely upon the claimant. Int'l Schools Servs, Inc. v. Twp. of West Windsor, 207 N.J. 3, 24 (2011) ("[I]n the context of tax exemptions, the burden is on the claimant to establish the right to the exemption.").

Initially, the court is not persuaded that RRI was organized exclusively as a school. As to the first prerequisite of the statute, analysis is generally confined to the language in the incorporation documents. See Paper Mill, 95 N.J. at 513-14. Cf. New Jersey Ass'n of School

15

<u>Bus. Officials, Inc. v. Twp. of Hamilton</u>, 22 N.J. Tax 467, 482 (Tax 2005) (organizational documents specifically limited services to a discrete section of society therefore entity was not organized "exclusively" for the MMI of the "general public," even if its activities indirectly benefitted the general public).

RRI's certificate of incorporation states that it is being incorporated to foster interest in aquatic activities, in furtherance of which RRI would provide training and instruction, plus own the requisite facilities. However, its by-laws, as well as the undisputed facts here, show that RRI also uses the Property (or at least Lot 21) for the exclusive benefit of its members' social or other entertainment activities. As such, it fails the exclusivity criteria set forth in <u>Paper Mill</u>. <u>See also</u> <u>Planned Parenthood of Bergen Cty., Inc. v. City of Hackensack</u>, 12 N.J. Tax 598, 610 (Tax 1992) (entity "not organized exclusively for charitable purposes" because corporate charter permitted two additional activities which were not charitable in nature), <u>aff'd</u>, 14 N.J. Tax 171 (App. Div. 1993).

Next, RRI's sailing club is not a "school" as that term has been interpreted. In <u>N.J. Carpenters Apprentice Training & Educ. Fund v. Borough of Kenilworth</u>, 147 N.J. 171 (1996), our Supreme Court rejected the argument that a school to train apprentices in carpentry is entitled to tax exemption of its property under N.J.S.A. 54:4-3.6. The Court initially observed that the term "school" could broadly mean "all institutions of learning," or under a "narrow" construction "include[e] only primary and secondary schools." <u>N.J. Carpenters</u>, 147 N.J. at 178 (citations omitted). The Court ruled that the narrow meaning is reasonable given the strict construction of tax exemption statutes, but more so because the term should be read in conformity with the

16

meaning afforded to the other terms in the statute such as "colleges . . . academies or seminaries." Ibid. ("If 'school' is read broadly to cover all institutions of learning, the other terms in the statute are superfluous; obviously, all colleges, academies, and seminaries are institutions of learning," and courts should avoid statutory construction resulting in statutory redundancy. Thus, a narrow reading "to include only primary and secondary schools," would allow for the other terms "'college,' 'academy,' and 'seminary'" to be given their "usual definitions."). See also id. at 189 ("To adopt the broad definition for 'school' would be tantamount to reading colleges, academies, and seminaries out of the statute. We are reluctant to interpret 'school' in a way that makes those other words superfluous.").

RRI is also contending for a broad construction of the term "school," namely that because it teaches its members the art (and science) of sailing, and its students (children and adults) learn how to sail, it is an institution of learning. Such an expansive meaning is not sustainable under our precedent, otherwise any non-academic training school or center can claim to be benefitting the general public because some of their children learn a particular art, science, or skill (e.g., dance, music, martial arts, rock-climbing). As our Court observed, although the meaning of "college" has been expanded to include "some nontraditional colleges," this "does not suggest that every barber's college or art school is also a college." Id. at 192 (emphasis added) (citing Twp. of Princeton v. Inst. for Advanced Study, 59 N.J. Super. 46 (App. Div. 1960)).

Nor has RRI shown that it is a traditional educational school. As the Borough points out, RRI's sailing classes are only for a few weeks in the summer, RRI is not accredited as a school by any governmental agency, and its certification of course completion is not akin to a graduation

17

school diploma or degree. See N.J. Carpenters, 147 N.J. at 189 ("[A]lthough the Fund serves an educational purpose in training the apprentices to become skilled carpenters, [it] is not a traditional school and does not benefit our society in the way the Legislature contemplated when it enacted" N.J.S.A. 54:4-3.6.).[14]

In sum, RRI is in not entitled to exemption as a school, as that term has been narrowly interpreted for purposes of tax exemption, simply because it gives sailing lessons.

(ii) The MMI Exemption

Clause 6 of N.J.S.A. 54:4-3.6 also exempts "all buildings actually used in the work of associations and corporations organized exclusively for the [MMI] of men, women and children." The exemption does not apply to any portion of the buildings which are leased to a for-profit entity or which are being used for a non-tax exempt, or a for-profit, purpose. Ibid.

As with the term "school" in the prior exemption clause, here also "[t]here is no legislative delineation of the [MMI] classification in the exemption statute. The cluster of abstract concepts themselves suggests that, at most, only a descriptive definition is contemplated." Chester Theatre Grp. of Black River Playhouse v. Borough of Chester, 115 N.J. Super. 360, 364 (App. Div. 1971).

---

[14] While not controlling, it should be noted that RRI's Form 990 stated that RRI does not "provide scholarships or financial assistance."

RRI relies on an unpublished opinion, Wee Love Inc. v. Twp. of Maple Shade, 2008 N.J. Super. Unpub. LEXIS 1675, *6 (App. Div. 2008). This court obviously is not bound by unpublished opinions. See R. 1:38-3. Nonetheless, it observes that the case does not help RRI. There, exemption was allowed to a day care center by likening it to a nursery school, and the Supreme Court in N.J. Carpenters, 147 N.J. at 180, implied that a nursery school would be eligible for exemption by citing it as an example of primary or secondary schools. However, N.J. Carpenters rejected the notion that any institution of learning, such as any "barber school or art school" is a school for purposes of N.J.S.A. 54:4-3.6. 147 N.J. at 192. This latter rejection controls here.

18

Arguably any activity which is not instinctively repugnant societally, when offered in an organized manner to the general public, could be considered to morally and mentally improve the public. Id. at 364-65 ("anything which pertains to the development or betterment of the mental faculties" could be "'mental improvement,'" while "morality" contemplates general approval of an "object" due a "common" public "sentiment."). See also Phillipsburg Riverview Org., Inc. v. Town of Phillipsburg, 26 N.J. Tax 167, 176 (Tax 2011) (MMI "classification has been applied to various public and civic organizations, which directly serve the public by contributing to the educational, cultural and spiritual development in society in general") (citation omitted), aff'd, 27 N.J. Tax 188 (App. Div. 2013).

As before, here also the court is unpersuaded that RRI was exclusively organized to promote the MMI of the general public. As noted above, while the certificate of incorporation is generally worded as to RRI's purposes (promote and encourage interest in "aquatic activities" by children and families, by providing training and instruction in the same, which the facts here show the training to be in sailing and participation in boat races), the by-laws show that the intended beneficiaries of RRI's purposes are its members since it delineates the different types of memberships and the rights/benefits associated with each type of membership, thus, member. The most benefits are for individuals with a family membership, which membership requires a fee. Memberships with no fees have limited benefits. These facts restrain the court to find that RRI is not organized exclusively for the MMI of the general public even if learning to navigate a boat in natural waters is a skill which can reasonably be said to aid or sharpen one's mental focus.

19

While the court need not analyze the MMI clause further, it points out that even under the second prong of the exemption statute, which is whether the property for which the exemption is sought is actually used for the alleged MMI of the general public, there are issues. The general public cannot access or use Lot 21, where the "on-land" sailing lessons and picnics or other social activities are held, unless they are members of RRI. Members can use RRI's dock and mooring field. The public cannot. Members can partake in the Club's social and entertainment affairs. The general public cannot.

Spectating a sailing race by the public does not suffice as proof that Lot 21 is actually used for the MMI of the general public. RRI's contention (in its legal brief) that its boat races allow the community access to the river, which is otherwise limited or non-existent (due to the private residences at the Borough's shoreline), does not make Lot 21 beneficial to the public, nor is allowing such spectatorship the same as providing a valuable public benefit or rendering an important public service. Rather, the boat races are akin to debut or recitals by students of any extra-curricular activity (dance, music, martial arts) where the students are able to demonstrate the skills they just learned, and proud family and friends watch as support. As such, then, access to Lot 21 by the public to spectate the boat races are not actual use of the parcel for the MMI of the public. Cf. City of Elizabeth v. Bayway Cmty. Ctr., 19 N.J. Misc. 263, 263 (Bd. of Tax Appeals 1941) (non-profit entity exclusively used buildings "to house a veritable multitude of activities, too numerous to recount here in detail, charitable, social and educational in nature, for the benefit of thousands of working class families in the neighborhood of the property, at little or no cost whatever to such persons"). Concededly, non-member youths, who can be students of the junior

20

sailing program, do have access and use of the parcel, and presumably all of the necessary sailing equipment. However, these children cannot partake in any of the club's activities or festivities, unlike the students who are RRI's members via an RRI membership.[15]

Nor is RRI's provision of loaner boats for a fee to a non-member RRI an altruistic and important public service. As RRI concedes, this is only done to entice RRI membership.

Finally, it is not at all clear that RRI's fees for sailing lessons being are below market rates. RRI so claims, but in its legal brief, and then without any objective proof. Asserting that something is below market does not make it so. The court cannot conclude that a 19-week course for 2½ days a week at $600 for non-member youths and discounted $375 for member youths is either comparable to, higher than, or below the rates charged by other sailing clubs in the vicinity for similar sailing lessons. That RRI's balance sheets or financial statements show that its revenues are either slightly higher than or roughly equal to expenses, does not mean or even prove that RRI is charging below-market fees.

In Advance Housing, Inc. v. Twp. of Teaneck, 215 N.J. 549 (2013), our Supreme Court listed the following as guiding principles "in making the fact-specific determination whether a non-profit corporation, organized for a charitable purpose, is 'actually' using property for a charitable purpose" thusly:

> Although all relevant considerations cannot be captured by any list
> given the ever-changing scenarios that will arise, and although each

---

[15] Also of benefit only to its members are discounted fees for the sailing training lessons. Even if the $370 membership fee is added to the $375 discounted fee for training, thus is higher than the $600 charged to non-member youths for the junior sailing program (rates for TY 2016), it should be noted that the $370 membership fee is annual and is for other benefits, while the training is only for the 3 months in summer and then for 2½ days a week.

consideration may not necessarily deserve the same weight, here are some that apply to the circumstances of this case: (1) the charitable work done by the private entity will spare the government an expense that ultimately it must bear . . . (2) the private entity must not be engaged in a seeming commercial enterprise . . . (3) the property must be used in a manner to further the charitable purpose . . . (4) the receipt of government subsidies or funds is not contraindicative of a charitable purpose . . . (5) financial support and recognition by the State of a private entity's charitable work may be indicative that its property is used for a charitable purpose . . . and (6) the private entity in carrying out its charitable mission through the use of its property is addressing an important and legitimate governmental concern . . . .

[Id. at 572-73 (citations and internal quotations marks omitted)].

See also id. at 568, 572 ("[O]ne justification for granting a charitable tax exemption is that if the charitable work were not done by a private party, it would have to be done at public expense," in other words, the entity's charitable work "will spare the government an expense that ultimately it must bear" (citation omitted)); Division of Taxation, Handbook for New Jersey Assessors, §412.06 (Oct. 2018) (if an entity provides a "charitable service that government itself would otherwise have to provide," but at a "lower cost, and serves a number of individuals who are not supported by government subsidies," then the entity is relieving a governmental "burden" justifying a tax exemption. "Entitlement to exemption depends upon circumstances, charges and public betterment.").

Thus, broad concepts of whether an activity is for the MMI of the general public should be balanced with the above important governmental/public interests, which the privately organized entity undertakes to do, thus, sparing the government the expense of the undertaking. Teaching young children sailing skills, while commendable generally since learning to sail is not a socially

22

repugnant concept, is simply not "addressing an important and legitimate governmental concern." And for the reasons stated above, the court is unpersuaded that RRI's Club exists for the benefit of the general public, nor is it convinced that the Property is being so used, or even if so used, that RRI is also not engaged "in a seeming commercial enterprise." Rather, it is a member-only sailing club, whose existence and activities are predominantly for the benefit of its members' recreational interests, not to contribute to the MMI of the general public. That the members benefit from "social intercourse" at the club and the sailing activities is not reason for grant of an exemption under the MMI clause. See Camden Lodge No. 111 v. City of Camden, 135 N.J.L. 532, 534 (Sup. Ct. 1947).[16]

(iii) Are the Storage Sheds on Lot 21 "Buildings" under N.J.S.A. 54:4-3.6?

As noted above, Lot 21 houses five storage sheds, each standing on cinder blocks or other wooden supports, fully enclosed on four sides and on top, the hinged doors having metal locks. The Borough agrees that these "storage-type structures" are reasonably necessary for the operation of RRI's sailing club. However, it argues that the statute exempts only buildings, which these storage sheds are not.

In construing a statute, any undefined word or phrase should "be given their generally accepted meaning, according to the approved usage of the language." N.J.S.A. 1:1-1. However, this principle does not apply if it would be "inconsistent with the manifest intent of the legislature or unless another or different meaning is expressly indicated." Ibid.

---

[16] Part III of RRI's federal Form 990 (for 2013-2015) which asked "What is the organization's primary exempt purpose" was left blank.

23

Here, the term "building" is being interpreted in the context of an exemption statute. Unquestionably, the legislative intent of an exemption statute is that which is expressed. N.J.S.A. 54:4-3.6, by its plain language, affords an exemption to "buildings," and the land incident to such buildings (up to 5 acres). See also Handbook for New Jersey Assessors, §412.02 (titled "Exempt Buildings" and listing the "buildings" which are exempt). The term "buildings" is not defined by the statute. However, assigning too broad a meaning to the term would violate legislative intent and the principle that exemption statutes should be strictly construed.

Thus, in Salvation Army v. Twp. of Alexandria, 2 N.J. Tax 292, 297 (Tax 1981), the court rejected the argument that certain "permanent tent platforms" on a campsite, were "buildings" for purposes of the N.J.S.A. 54:4-3.6. These platforms were made of wood, about 18′x24′ and "rested on single cinderblocks" which were not "embedded in the ground" so that the platforms were above the ground, and were used to pitch tents during the summer, in which campers stayed for a short portion of their camp. Salvation Army, 2 N.J. Tax at 300-01. The court held that these platforms on their own were not buildings, nor became one with a tent atop (since together it provided shelter to campers) because this would be an "unreasonable conclusion." Id. at 301. Rather, "for something to qualify as a building in the structural sense, it must have more substance than canvas walls and a canvas roof." Ibid. More importantly, the "tent platform structure" was not a building "in the sense intended by the statute," but was incidental to camping and a "temporary device." Ibid. (citing and quoting Children's Seashore House v. City of Atlantic City,

24

68 N.J.L. 385 (1902) (internal quotation marks omitted)[17]). Thus, and while cabins on the campsite were "buildings within the intent of the statute because they provide permanently available housing that is obviously essential to plaintiff's purpose of operating a summer camp," the tent platforms were not within such legislative intendment. Id. at 302. See also Cooper Hosp. v. City of Camden, 68 N.J.L. 691, 706 (1903) (exemption statute cannot be "so broad[ly]" construed, rather, "[i]t confines the exemption to the building in which the work is actually conducted and the land upon which the building stands . . . ."); City of Hackensack v. Hackensack Med. Ctr., 9 N.J. Tax 460, 462 (Tax) ("[G]uardhouse on the parking lot does not constitute a 'building' within the contemplation of the statute[.]") (citations omitted), aff'd, 228 N.J. Super. 310 (App. Div. 1988); Fairleigh Dickinson Univ. v. Borough of Florham Park, 5 N.J. Tax 343, 356 (Tax 1983) ("[G]uard houses" were not "buildings" since no proof that they were "of sufficient permanence to be [so] considered") (citation omitted)).

Clearly, the storage sheds on Lot 21 are not meant for human residence or habitation. They are not equipped with any utilities. There are no windows or other means of ventilation. They are

---

[17] There, the Supreme Court held that a "frame tenement used for a kitchen and laundry only" was not "a building in the sense" of the tax exemption statute even if it could be deemed as one "within the ordinary definition of" the term "taken in its broadest sense." Children's Seashore House, 68 N.J.L. at 390. The Court held that "buildings are the principle subject-matter of the exemption," thus, when juxtaposed with "associated words" of "colleges, school-houses, buildings . . . used for religious worship, buildings used" for taking care of "feeble-minded" individuals showed that "buildings here intended were to be such as would comfortably house the class of persons to be benefited by the charity and the officers and agents who were to administer the same." Ibid. Further, the statute's extension of exemption to the land "necessary to the fair enjoyment of the buildings" indicated that "the building was to be the principal factor in the scheme and not a mere incident to the purposes of an encampment or some other temporary device." Ibid. (internal quotations omitted).

25

not permanent and are not affixed to the ground. As such, and while they may be structures in the broad sense of word (enclosed space with a roof), they are not buildings in the sense intended by the Legislature in N.J.S.A. 54:4-3.6.

RRI contends that the storage sheds on Lot 21 are not like the tent platforms, but more similar to the "miscellaneous outbuildings" which were exempted in Salvation Army, 2 N.J. Tax at 294. However, there the taxing district did not contend that these outbuildings should be taxable. Rather, it only disputed exemption for "the 'nine permanent tent platforms.'" Id. at 297. Thus, there was no finding in this regard by the court, nor are there facts as to these "outbuildings" which can be analogized to the storage sheds on Lot 21.

RRI argues that the storage sheds are reasonably necessary for operation of the sailing club operation and activities, thus, must be exempted similar to exemptions afforded "ancillary" buildings. However, by the very term "ancillary," it is evident that there must be one or more actual buildings in existence, which here there is none. Thus, for instance, in Blair Academy, when the court agreed exemption was warranted for, among others, "a maintenance shop and a so-called maintenance garage" there was no dispute that the school campus contained "many buildings." 95 N.J. Super. at 587-88. This is why the court agreed that exemption can be afforded to the "auxiliary buildings" (a "one-story building" which housed maintenance supplies/equipment for the school, and a garage "across the street" which contained equipment such as trucks, mowers, snow plows for the school's use) as they were "part of the school plant . . . essential to the maintenance thereof." Id. at 588-89. Lot 21 does not have many buildings or even one main building to deem the storage sheds as auxiliary or ancillary.

26

Likewise, in Fairleigh Dickinson Univ., the court analyzed the school's campus "as a whole in relation to [the school's] purpose and not merely as a composite of unrelated, individual buildings," 5 N.J. Tax at 356, and therefore included a greenhouse and a storage building as among the 37 buildings on one portion of the school's campus.[18] Again, Lot 21, when viewed as a whole, has no buildings but only the storage sheds. In sum, the court agrees with the Borough that the storage sheds are not buildings for purposes of N.J.S.A. 54:4-3.6.

(iv) Exemption for Lot 71

A vacant lot is not entitled to an exemption. Salvation Army, 2 N.J. Tax at 296. However, it can be if it is contiguous to the "mother" lot which is exempt, and is reasonably necessary for the non-profit activities of the entity seeking the exemption. See, e.g., Boys' Club of Clifton, Inc. v. Twp. of Jefferson, 72 N.J. 389, 401-02 (1977) (N.J.S.A. 54:4-3.6 "does not restrict the exemption to the precise land on which the building is located," and the statute's language that "the land must be 'necessary for the fair enjoyment'" of the building means land "reasonable necessary" to enjoy "the use of the building," thus, for purposes of the entity's tax exempt activities); Planned Parenthood, 12 N.J. Tax at 617-618 (parking lot across the street was exempt because it was actually used by the employees, mostly female, and provided to them as an incentive and for their safety due to "night-time security and limited off-street parking."); Handbook for New Jersey Assessors, §412.0 ("Land may be exempt where contiguous to land on which exempt buildings are located").

---

[18] And even then, the court found that "the three guard houses are not buildings [since] [t]here was no evidence that the[y] were of sufficient permanence to be considered buildings." Fairleigh Dickinson Univ., 5 N.J. Tax at 356 (citing Salvation Army, 2 N.J. Tax 292).

Here, it is undisputed that Lot 71 is contiguous to Lot 21. However, the court has not been convinced that the latter parcel should be tax exempt for various reasons. Therefore, there is no reason to analyze whether Lot 71 should or could have been exempted, which thus leaves only one conclusion: that Lot 71 cannot be exempt on its own, being vacant.

**CONCLUSION**

For all of the above reasons, the court denies RRI's motion for summary judgment, but grants the Borough's cross-motion for summary judgment. The judgments of the County Board are affirmed. An Order and Final Judgment in this regard will accompany this opinion.

Very Truly Yours,

Mala Sundar, J.T.C.

28